[No. G035868. Fourth Dist., Div. Three. Aug. 15, 2006.]

In re Marriage of RALPH and KATHLEEN BALCOF.
RALPH BALCOF, Respondent, v.
KATHLEEN BALCOF, Appellant.

1510

1512

COUNSEL

Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Appellant.

Honey Kessler Amado for Respondent.

OPINION

**MOORE, J.**—In a prior appeal,[1] Kathleen Balcof challenged a judgment holding that a writing she and her husband, Ralph Balcof, signed during marriage did not constitute a transmutation of certain of his property interests to those of hers.[2] We held that the writing satisfied the requirements for a transmutation of Ralph's interest in the marital residence and 20 percent of the stock in his separate property corporation. However, we observed that Ralph had been precluded from presenting evidence to the effect that he was under duress when he signed the writing. Consequently, we reversed and remanded the matter to give him an opportunity to present his evidence and to make his arguments concerning the enforceability of the otherwise valid transmutation. On remand, the trial court held that the transmutation document was unenforceable due to both duress and undue influence.

Kathleen appeals, challenging the judgment on a plethora of grounds. We hold that the trial court did not exceed the scope of this court's instructions on remand, and furthermore, that retrial was not precluded either because of a "judicial admission" on Ralph's part or because of case law concerning the use of extrinsic evidence. We also hold that substantial evidence supports the trial court's findings on both duress and undue influence. In addition, the trial court did not err in receiving the testimony of Attorney Brenda Agren, the tape recording of a discussion between Kathleen and the children, or the stipulated evidence that Kathleen struck Ralph in the face in front of the children. Finally, the statement of decision was not inadequate and the motion for new trial was properly denied. We affirm the judgment and the order denying the new trial motion.

I

FACTS

Ralph and Kathleen were married in 1988. They had two children, born in 1990 and 1992, respectively. In October 1999, Ralph and Kathleen signed a

---

[1] *In re Marriage of Balcof* (Nov. 21, 2003, G030572) (nonpub. opn.).

[2] Hereafter, we refer to the parties by their first names, as a convenience to the reader. We do not intend this informality to reflect a lack of respect. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475–476, fn. 1 [274 Cal.Rptr. 911].)

writing concerning their marital residence and a portion of the stock in Ralph's separate property corporation. They separated three or four months later. Ralph filed a petition for dissolution in January 2000. Their marriage was dissolved as to status only on December 5, 2000.

The court bifurcated the trial proceedings pertaining to the effect of the October 1999 writing. The first issue to be tried was whether the writing constituted a transmutation of Ralph's community property interest in the marital residence and 20 percent of his stock in his separate property corporation, to Kathleen as her separate property. The second item to be tried, provided that the October 1999 writing were held to be a transmutation, was whether there were any defenses to the enforcement of the writing.

After a trial on the first issue, the court held that the October 1999 writing was ineffective to transmute property from that of Ralph to that of Kathleen. Given this, there was never any trial pertaining to Ralph's defenses to the enforceability of the October 1999 writing. Kathleen appealed from the judgment to the effect that the October 1999 writing was not a transmutation.

On appeal, we held that the October 1999 writing satisfied the transmutation requirements of Family Code section 852. However, we observed that Ralph had never had his opportunity to raise his claim of duress, so we remanded the matter for further trial proceedings.

On remand, the trial court entered judgment in favor of Ralph, holding that the October 1999 writing was unenforceable due to duress and undue influence. It thereafter denied Kathleen's new trial motion. Kathleen again appeals.

II

DISCUSSION

A. *Background:*

The following background information is taken directly from the prior opinion:

*"(1) Prenuptial agreement*

"Shortly before their marriage, the parties signed a prenuptial agreement, the validity of which is not an issue in this matter. As disclosed in the exhibits to the agreement, Ralph then owned property worth several million

dollars, including more than $2 million in Bolcof Plastic Materials, Inc. stock.[3] Kathleen's assets were minimal.

"Under the prenuptial agreement, the parties agreed that Ralph would transfer the bulk of his property into a separate property trust and that Kathleen would not acquire any interest in that property or in the trust during the course of the marriage. In short, she would never acquire any interest in Bolcof Plastic Materials, Inc., even to the extent the value of the corporation might increase due to the efforts of Ralph during the marriage. However, Ralph agreed to transfer two $15,000 life insurance policies he owned to himself and Kathleen as community property. Also, Ralph and Kathleen agreed that if they were still living together as man and wife upon Ralph's death, Kathleen would receive the marital dwelling, free and clear of debt, plus $250,000.

"At the time the prenuptial agreement was signed, the parties had not yet acquired the property located on Pelican Drive, which was purchased after marriage and was not placed in the trust.

*"(2) Transmutation document*

"The parties have stipulated that in October 1999, while they were in a room together at an inn, Ralph penned a writing which is the subject matter of this dispute. That writing provides as follows: 'I, Ralph Balcof Deed over all Interest in our house at 770 Pelican Dr.—Laguna Beach—also 20% interest (stock) in Bolcof Plastic Materials[.] This will be legal by Dec 1 1999[.]' Then appear the signatures of each of Kathleen and Ralph. Immediately thereafter is written: 'P.S. I will pay $1000 a day Penlty [*sic*] iF [*sic*] this is not done by Dec 1[.]' [¶] . . . [¶]

*"(3) Stipulated judgment*

"In the March 12, 2002 judgment on reserved issues, the court divided certain [of] the assets between the parties and ordered the payment of spousal and child support, pursuant to their stipulated judgment.

"Ralph stipulated to pay Kathleen the sum of $8,000 per month in spousal support while she was living in the marital dwelling. After she vacated the dwelling, Ralph was required to pay her $12,000 per month, until the first to occur of the death of either party, Kathleen's remarriage, or June 15, 2012. The judgment contains a provision for the payment of an additional $33,000

---

[3] "In his respondent's brief, Ralph explains that the parties' correct surname is 'Balcof' but that the company name is 'Bolcof.' "

in spousal support for a time period that cannot be ascertained due to the fact a portion of the copy of the judgment as contained in the record is illegible. In addition, the judgment addressed the provision of COBRA medical insurance coverage for Kathleen.

"Ralph also stipulated to pay child support in the amount of $2,488 per month for his daughter, Kelsey, and $4,172 per month for his son, Andrew. He further committed to provide health insurance for the children.

"In addition, Ralph stipulated to maintain an initial sum of $500,000 in life insurance, decreasing by $50,000 each year, with respect to spousal support. He also agreed to maintain $75,000 in life insurance with respect to child support.

"The court awarded Ralph the marital dwelling, with an assigned value of $2 million, as his sole and separate property. In addition, it awarded Ralph half of the miscellaneous personal property, furniture and furnishings the parties acquired during marriage, half of the parties' three Wells Fargo checking accounts, and half of the $403,177.56 community interest in the Bolcof Plastic Materials, Inc. Profit-Sharing Plan and Trust.

"Kathleen was awarded, as her sole and separate property, the following: (1) $123,026 in a joint Wells Fargo account; (2) $154,745 in the parties' Paine Webber account; (3) $141,000 in pre-distributions of community funds; (4) a 1996 GMC Suburban automobile; (5) half of the miscellaneous personal property, furniture and furnishings the parties acquired during marriage; (6) half of the parties' three Wells Fargo checking accounts; (7) half of the $403,177.56 community interest in the Bolcof Plastic Materials, Inc. Profit-Sharing Plan and Trust; (8) the Mammoth condominium, valued at $403,000; and (9) an equalization payment of $589,114.50. Also, Ralph was ordered to pay $100,000 of Kathleen's attorney fees.

"In addition to the foregoing, the judgment recited that Kathleen had indicated that she might file an appeal with respect to the characterization of the marital dwelling and the Bolcof Plastic Materials, Inc. business. The parties reserved the right to assert different values for those assets and to argue that the amount of the equalization payment was incorrect, depending on the outcome of any appeal.

"In the April 17, 2002 judgment on reserved issues, Ralph was awarded the following items as his sole and separate property: (1) any and all shares of Bolcof Plastic Materials, Inc. common stock; (2) any and all shares of e-resin.com common stock; (3) any and all shares of Bolcof Plastic Materials (Southeast), Inc. common stock; (4) any and all interest in Azusa Packaging,

a California general partnership; (5) certain real property located in Azusa; and (6) certain real property located in Fontana."

On remand, the trial court held that the April 17, 2002 judgment on reserved issues would remain in full force and effect.

B. *Kathleen's Arguments:*

(1) *Introduction:*

Kathleen has chosen to wage a wide-ranging attack on many fronts. She claims: (1) retrial was precluded because of a "judicial admission" on Ralph's part; (2) the case should not have been remanded because of case law concerning the use of extrinsic evidence; (3) the trial court exceeded the scope of this court's instructions on remand; (4) the trial court's findings on duress were not supported by the evidence; (5) Ralph waived his right to rescind the October 1999 writing due to duress; (6) Ralph ratified the October 1999 writing; (7) the trial court erred in receiving the testimony of Attorney Agren into evidence; (8) the trial court erred in receiving a tape recording into evidence; (9) the evidence that Kathleen struck Ralph in the face in front of the children was irrelevant and prejudicial; (10) the statement of decision was inadequate; and (11) the motion for new trial should not have been denied. We address these arguments in turn.

(2) *Prior opinion:*

Kathleen levels a tardy attack on this court's opinion in the prior appeal. She says that the case never should have been remanded at all, for two reasons. First, she says that Ralph conceded, in an October 16, 2001 memorandum of points and authorities in opposition to motion to certify judgment, that the court had "bifurcated for early hearing the issue of the validity and enforceability of a handwritten document . . ." and that "[f]ollowing full hearing on the matter the court ruled the document was ineffective as a transmutation of any interest in the real property or the stock." She says this wording constitutes a concession that the enforceability of the transmutation document was already resolved by the trial court and that the doctrine of judicial admission bars a remand for a trial on defenses to the enforceability of the writing. Second, Kathleen says that the case should not have been remanded because case law (see, e.g., *Estate of MacDonald* (1990) 51 Cal.3d 262 [272 Cal.Rptr. 153, 794 P.2d 911]) encourages courts to resolve transmutation issues without resort to extrinsic evidence.

■ Kathleen's arguments challenging this court's prior opinion come too late. The opinion is a final decision of this court and we have no power to review it. (Cal. Rules of Court, rules 24(b), 25(a); *Woodridge Escondido Property Owners Assn. v. Nielsen* (2005) 130 Cal.App.4th 559, 577 [30 Cal.Rptr.3d 15].) ■ "Under the law of the case doctrine, ' "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." ' [Citation.]" (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309 [126 Cal.Rptr.2d 516].) If Kathleen believed that this court had made an error in ordering a remand, her remedy was to bring a petition for rehearing on the matter. (Cal. Rules of Court, rule 25.) Furthermore, we are not persuaded either that Ralph's imprecise wording in his October 16, 2001 memorandum of points and authorities constituted a waiver of defenses to enforcement, or that *Estate of MacDonald, supra,* 51 Cal.3d 262, would make consideration of defenses inappropriate. But we need not resolve either of these issues. The prior decision of this court is final and the trial court did not err in following the remand instructions.

(3) *Scope of Remand:*

In our prior opinion, we stated: "Kathleen Balcof appeals from a judgment holding that a writing she and her husband, Ralph Balcof, signed during marriage did not constitute a transmutation of certain of his property interests to those of hers. We agree with Kathleen that the writing contained an express declaration of a change in ownership with respect to certain real property and stock holdings, and that it was a valid transmutation as to those items. However, the writing did not constitute a present transmutation of penalties in the amount of $1,000 per day, which would accrue, if at all, only on the happening of a future event. In addition, we observe that Ralph was precluded from presenting evidence to the effect that he was under duress when he signed the writing, so the matter must be remanded to give him an opportunity to present his evidence and to make his arguments concerning the enforceability of the otherwise valid transmutation. We reverse and remand." (Fn. omitted.)

According to Kathleen, when this court referenced Ralph's argument concerning duress, we meant to limit the remand to that issue exclusively. She further contends that, because the trial court's actions exceeded the scope of the instructions on remand, those actions are void. She reads our remand instructions too narrowly.

The remand was intended "to give [Ralph] an opportunity to present his evidence and to make his arguments concerning the enforceability of the otherwise valid transmutation." Although it was anticipated that the arguments concerning enforceability would include arguments on duress, which Ralph had mentioned specifically, there was no intention to exclude any other arguments Ralph might make with respect to enforceability, such as undue influence. The court correctly understood the instructions on remand and did not err by permitting the presentation of evidence and argument on undue influence.

### (4) *Undue Influence:*

Aside from contending that the trial court should not have considered undue influence at all, Kathleen makes little argument concerning that defense. In its statement of decision, the trial court held that "[Kathleen] exerted undue influence on [Ralph] in order to obtain the [October 1999] writing." Ralph asserts that this holding was correct. We agree.

According to Family Code section 721, subdivision (b), husbands and wives "are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. . . ." "If one spouse secures an advantage from [an interspousal] transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside. [Citation.]" (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 628–629 [35 Cal.Rptr.3d 1]; see also *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 996–997 [4 Cal.Rptr.3d 378].) "Generally, a spouse obtains an advantage if that spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits. [Citation.]" (*In re Marriage of Mathews, supra,* 133 Cal.App.4th at p. 629.)

In this case, Kathleen secured an advantage through the October 1999 writing, because she obtained a 20 percent interest in Ralph's separate property corporation as well as his share of the marital residence. (See *In re Marriage of Delaney, supra,* 111 Cal.App.4th at pp. 995–997.) Therefore, the statutory presumption arose that she exercised undue influence against Ralph in obtaining his signature on the October 1999 writing, and that the writing should be set aside. (*In re Marriage of Mathews, supra,* 133 Cal.App.4th at pp. 628–629; *In re Marriage of Delaney, supra,* 111 Cal.App.4th at pp. 996–997.)

"The burden of rebutting the presumption of undue influence [was] on [Kathleen, as] the spouse who acquired an advantage or benefit from the transaction. [Citation.]" (*In re Marriage of Mathews, supra,* 133 Cal.App.4th

at p. 630.) "Consequently, it was [her] burden to establish [Ralph's] signing of the [October 1999 writing] was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of its effect of making the [shares of stock and the marital residence] separate property. [Citation.]" (*Ibid.*) It was her burden to rebut the presumption by a preponderance of the evidence. (*Id.* at p. 631.) Substantial evidence supports the trial court's implied finding that Kathleen did not rebut the presumption by a preponderance of the evidence. (*Id.* at pp. 631–632 [standard of review is substantial evidence, of proof by preponderance of evidence].)

The trial court found that "[t]he writing was a transaction between the parties, which arose out of their confidential relationship as spouses and was not made at arms length." It also found that "[Kathleen] gained an advantage over [Ralph] by virtue of the writing, in that it transferred assets to her which she did not previously own." In addition, the court stated, in its statement of decision: "4. [Kathleen] threatened [Ralph] with divorce and the obstruction of his relationship with their children if he did not prepare the writing. [¶] 5. [Kathleen] harangued and berated [Ralph] during the marriage in an effort to force him to modify the parties' prenuptial agreement to provide more security for [her]. The berating included several incidents where [Kathleen] physically struck [Ralph]. [¶] [Kathleen] screamed at [Ralph] for at least 45 minutes immediately preceding his writing the October 1999 writing, which screaming included threats of divorce and obstructing [Ralph's] relationship with the minor children if he did not make the writing. [Ralph] reasonably believed [Kathleen's] threats, and that she intended to follow through with her threats. These threats alone or coupled with his state of mind resulting from the many prior episodes of verbal and physical abuse, constituted duress which resulted in his making the writing. [¶] Further, [Kathleen] subjected [Ralph] to a continuous barrage of yelling and threats of divorce and obstructing [Ralph's] relationship with the minor children in the parties' hotel room from the time he started the writing until he was initially finished. Thereafter, [Kathleen's] barrage of threats continued until [Ralph] wrote an additional penalty clause, which he did at her insistence. [¶] Coupled with the prior history of [Kathleen's] haranguing and berating [Ralph] concerning the prenuptial agreement, the threats to take his children away from him immediately before he made the writing, unless he made the writing, constituted duress."

The threats also constituted undue influence, inasmuch as his execution of the document was not "freely and voluntarily made." (*In re Marriage of Mathews, supra,* 133 Cal.App.4th at p. 630; see also *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 83 [260 Cal.Rptr. 403] [consent is not

"free" when obtained through duress, menace, or undue influence].) He executed the document as a reaction to Kathleen's continued yelling and screaming and out of fear that she would otherwise block him from having a continued relationship with his children.

Ralph's testimony at trial provided substantial evidence of Kathleen's striking him on occasion, and from time to time screaming at him and threatening to disrupt his relationship with his children if he did not provide her with the property she demanded. It also provided substantial evidence that, on the date of the October 1999 writing, she yelled and screamed at him and threatened him until he complied with her demand to write what she told him to right then and there. "Free" and "voluntary" are not words that appropriately describe his actions on the date in question.

■ Moreover, Ralph testified that he broke down and wrote word-for-word what Kathleen dictated to him. He further testified that he did not know the legal effect of the words he was writing and that he did not have an opportunity to discuss their legal effect with counsel. His testimony on these points provided substantial evidence that he did not sign the October 1999 writing "with a complete understanding of the effect" of doing so. (*In re Marriage of Mathews, supra,* 133 Cal.App.4th at p. 630; see *In re Marriage of Baltins, supra,* 212 Cal.App.3d at p. 85 [lack of independent advice a factor to be weighed in determining if party acted voluntarily and with understanding of transaction].)

True enough, Kathleen testified contrarily to Ralph, both about the circumstances surrounding the execution of the October 1999 writing, and about whether she had the habit of striking him, screaming at him, and threatening to undermine his relationship with his children. Given the conflicts in the respective testimony of Kathleen and Ralph, it is clear that one of them was lying. The trial court found: "As to the events at the time the October 1999 writing was made, [Ralph's] testimony was credible, but [Kathleen's] testimony was not."

■ "The power of a reviewing court begins and ends with a determination of whether there is in the record substantial evidence, contradicted or uncontradicted, which supports the result reached; and we must also assume in favor of the determination below the existence of every fact which the trier of facts could have reasonably deduced from the evidence. [Citation.]" (*In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 745 [129 Cal.Rptr. 566].) Substantial evidence supports the trial court's determination that Ralph's version of events was more credible, that Ralph did not freely and voluntarily

execute that October 1999 writing, that Ralph did not understand the legal significance of his execution of the writing, and that Kathleen did not meet her burden to rebut the presumption of undue influence by a preponderance of the evidence. Consequently, we hold the October 1999 writing is unenforceable as the product of undue influence.

### (5) *Duress:*

#### (a) *introduction*

Kathleen argues at length that Ralph did not prove duress. As a technical point, this is a matter we need not address, inasmuch as the October 1999 was unenforceable as a result of undue influence. However, we nonetheless choose to address her concerns.

#### (b) *burden of proof*

Kathleen says that Ralph was required to show duress by clear and convincing evidence. She supports her argument with a citation to *Stevenson v. Stevenson* (1940) 36 Cal.App.2d 494 [97 P.2d 982]. That case was decided before Evidence Code section 115 became operative in 1967. (Stats. 1965, ch. 299, § 2, pp. 1297–1298.) As at least one commentator has observed, "[e]arly decisions require proof of the existence of duress . . . with reasonable certainty by clear, cogent and convincing evidence, but these decisions no longer have vitality following the Supreme Court's 1977 decision [*Liodas v. Sahadi* (1977) 19 Cal.3d 278 [137 Cal.Rptr. 635, 562 P.2d 316]] rejecting the application of a burden of proof in excess of a preponderance of the evidence in fraud cases. There is no statutory or logical basis for imposition of a higher level of proof for duress than for fraud." (2 Schwing, Cal. Affirmative Defenses (2006 ed.) § 33:9, fns. omitted; see also *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 483 [286 Cal.Rptr. 40, 816 P.2d 892]; *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487 [61 Cal.Rptr.2d 493].)

 "Evidence Code section 115 provides for three burdens of proof . . . . ' "Except as otherwise provided by law," ' issues of fact are determined by a preponderance of the evidence. ([Citation]; Evid. Code, § 115.)" (*In re Marriage of Peters, supra,* 52 Cal.App.4th at p. 1490, italics omitted.) "The degree of burden of proof applied in a particular situation is an expression of the degree of confidence society wishes to require of the resolution of a question of fact. [Citation.] The burden of proof thus serves to allocate the risk of error between the parties, and varies in proportion to the gravity of the consequences of an erroneous resolution. [Citations.] Preponderance of

the evidence results in the roughly equal sharing of the risk of error. [Citation.] To impose any higher burden of proof demonstrates a preference for one side's interests. [Citation.] Generally, facts are subject to a higher burden of proof only where particularly important individual interests or rights are at stake . . . . [Citations.]" (*Ibid.*)

"[W]hen we compare [the] risk of the loss of an economic interest with the interests at stake in cases applying the 'clear and convincing' standard, it falls short. All involve interests more substantial than the mere loss of money. [Citations.]" (*In re Marriage of Peters, supra,* 52 Cal.App.4th at p. 1492.) "Because the interests at stake [in the case before us] are the same for both parties and the interests involved are economic, the parties should share the risk of error roughly equally. The preponderance of the evidence standard is sufficient." (*Id.* at p. 1494.)

Based on the same evidence noted in our discussion of undue influence, Ralph met his burden to demonstrate duress, by a preponderance of the evidence. Kathleen disagrees.

### (c) *free will*

In addition to pointing to the portions of her testimony that conflict with his, Kathleen, again citing older case law (see, e.g., *Burke v. Gould* (1894) 105 Cal. 277 [38 P. 733]), says that there was no duress because Kathleen did not commit any unlawful act or subject Ralph to confinement in order to get his signature. However, "[t]he stringent definition of duress contained in Civil Code section 1569, codifying the early common law rule, has been relaxed. [Citations.] Under the modern rule, ' "[d]uress, which includes whatever destroys one's free agency and constrains [him or her] to do what is against [his or her] will, may be exercised by threats, importunity or any species of mental coercion [citation] . . . ." ' [Citation.] It is shown where a party 'intentionally used threats or pressure to induce action or nonaction to the other party's detriment. [Citation.]' [Citations.] The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing. [Citation.]" (*In re Marriage of Baltins, supra,* 212 Cal.App.3d at p. 84, fns. omitted.)

In this case, Ralph's free will was constrained by Kathleen's threats to deny him access to his children. Kathleen disagrees, saying that any threat to deny Ralph access to the children could hardly constitute duress, inasmuch as child custody and visitation matters are resolved by the courts. She emphasizes that Ralph, as a successful businessman, had access to lawyers and

should have known better than to be frightened at the suggestion that she somehow could have thwarted his rights to see his children. However, as Ralph testified, he did not discuss Kathleen's threats with legal counsel until after the date he was constrained to execute the October 1999 writing. Moreover, it is not unheard-of for one parent to fail to comply with court custody or visitation orders or to engage in efforts to scuttle the relationship between the children and the other parent. As a practical matter, the courts are ill-equipped to undo the damage done by infighting parents.

It is true, as Kathleen suggests, that the facts of the case before us are not as egregious as those in the case of *In re Marriage of Gonzalez, supra*, 57 Cal.App.3d 736, wherein the husband threatened to remove the children to another country and even intimated that he might have the wife killed. However, that does not mean that the degree of coercion in the case before us was not sufficient to rise to the level of duress. Kathleen "aimed at [Ralph's] most vulnerable spot" when she threatened to interfere with his relationship with the children. (*In re Marriage of Baltins, supra*, 212 Cal.App.3d at p. 86.)

It is also true, as Kathleen states, that Ralph admitted he was not actually afraid for his physical safety on account of Kathleen's physical abuse of him. The fact that he did not expect to wind up in the hospital the next time she struck him does not, however, mean that her abuse did not have a cumulative and real effect on his mental state.

(d) *failure to rescind*

Continuing on, Kathleen asserts that Ralph is precluded from obtaining relief on the ground of duress, because he failed to promptly rescind the October 1999 writing.[4] In support of that assertion, she cites a number of old cases concerning rescission of fully or partially performed contracts based on fraud, primarily cases having to do with real estate transactions. (See, e.g., *Fabian v. Alphonzo E. Bell Corp.* (1942) 55 Cal.App.2d 413 [130 P.2d 779]; *Campbell v. Title Guarantee etc. Co.* (1932) 121 Cal.App. 374 [9 P.2d 264].) These cases, founded on Civil Code section 1691, are inapposite.

Kathleen omits to address the underlying statute, which provides: "Subject to Section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind if he is free from duress, menace, undue influence or disability and is aware of his right to rescind: [¶] (a) Give notice of rescission to the party as to whom he rescinds; and [¶] (b) Restore to the other party everything of value which he has

---

[4] In her reply brief, Kathleen argues at length that Ralph's failure to rescind the October 1999 writing also precludes him from obtaining relief on the ground of undue influence. Our analysis of the rescission issue applies equally to both the duress and undue influence defenses.

received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so. . . ." (Civ. Code, § 1691.) Civil Code section 1693 states in part that "[w]hen relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party."

A plain reading of Civil Code section 1691 indicates that the party seeking to rescind must do so promptly, as long as he or she is free from duress, menace or undue influence or disability. In this case, the duress continued after the date of the October 1999 writing, so that the requirement to rescind promptly was held in abeyance. Moreover, under Civil Code section 1693, any delay on Ralph's part to promptly provide Kathleen with notice of rescission would not preclude relief, unless Kathleen were substantially prejudiced by the delay. Kathleen does not explain what prejudice she suffered.

The only case that Kathleen cites that bears any similarity to the case before us is *Clanton v. Clanton* (1942) 52 Cal.App.2d 550 [126 P.2d 639]. In that case, the husband and wife entered into a property settlement agreement concerning the division of 20 parcels of real property, and 20 items of personal property, including oil leases and subleases, and stocks and bonds. (*Id.* at p. 552.) The husband subsequently filed a complaint for divorce and annulment of the property settlement agreement. (*Ibid.*) The trial court sustained a demurrer to the cause of action for annulment of the property settlement agreement. (*Ibid.*) The appellate court affirmed. (*Id.* at p. 558.)

The appellate court in *Clanton* stated that the case was none other than one for rescission of the fully performed property settlement agreement. (*Clanton v. Clanton, supra,* 52 Cal.App.2d at pp. 553–554.) It noted that the agreement had been effectuated "by duly executed conveyances, presumably at or about the time of the execution of the agreement." (*Id.* at p. 553.) The court further noted that the husband had not offered to restore the wife to her share of the properties he had acquired pursuant to the agreement, and, additionally, that he had delayed for a period of 22 months in bringing his action. (*Id.* at pp. 554, 557.) The court concluded that the husband's "neglect to act promptly is fatal to his right to rescind. Not even the slightest effort was made to excuse the delay. . . . It is to be assumed that [the wife] had been dealing with her share of the property as her own and that [the husband] had been doing likewise. During this long period of time each party had had the advantages and had suffered the disadvantages consequent upon their agreement. . . . The elapse of time inevitably brings changed conditions with

resulting advantages and disadvantages to the respective parties, and obstacles arise which make it difficult, if not impossible, to restore the parties to their former status, a desideratum of rescission which distinguishes it from other forms of relief." (*Id.* at pp. 557–558.)

There is no reason why *Clanton v. Clanton, supra,* 52 Cal.App.2d 550, should compel a reversal in the case before us. No properties were transferred pursuant to the October 1999 writing, so neither party has suffered advantages or disadvantages based upon a transfer. Moreover, despite Kathleen's protestations, there was no lengthy delay in challenging the writing. It was signed in October 1999 and Ralph filed his petition for dissolution of marriage in January 2000, asserting therein that his separate property was defined by the prenuptial agreement. Property ownership and division then became a matter for court determination. Kathleen simply has not convinced us that laws pertaining to the rescission of fully performed contracts should apply to preclude Ralph from challenging the enforceability of the October 1999 writing in this context.

### (e) *ratification*

Finally, Kathleen argues that Ralph ratified the October 1999 writing. She claims that the evidence of ratification includes (1) Ralph's failure to rescind, (2) a "to-do list," (3) a car transfer, and (4) meetings with Attorney Mitchell Schwary. We have already discussed the significance of the lack of rescission and need not belabor that point. We address Kathleen's other items in turn.

The record contains an undated and unsigned handwritten list of eight action items. The items pertained to a trust, life insurance, title to the house, stock options, alimony, title to cars, profit sharing, and notification of Kathleen when actions were completed. The parties gave conflicting testimony as to the date and significance of this list. Kathleen testified that Ralph, of his own volition, made the list towards the end of December 1999. Ralph, on the other hand, testified that he wrote the "to-do list" in the summer of 1999 "[a]t Kathleen's insistence," during one of "[h]er yelling sprees." He stated that Kathleen "wanted [him] to do everything and then show her that [he] had done everything." Ralph further testified that he did not take most of the actions on the list, but that he did put a Jaguar in her name in December 1999.

Resolving the conflicting evidence in a light most favorable to the judgment (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 36 [71 Cal.Rptr.2d 314]), it would appear the "to-do list" is evidence not of a ratification of the October 1999 writing, but rather of a precursor to it. That is, Ralph wrote out the "to-do list" in the summer of 1999, during one of Kathleen's earlier

"yelling sprees" and by October 1999 Kathleen was so angry that he had not taken the actions itemized on the list that she engaged in another "yelling spree" until he wrote out the terms of the October 1999 writing, including a penalty clause in case he did not get the job done this time. Furthermore, the transfer of the Jaguar to Kathleen in 1999 is not evidence of a ratification of the October 1999 writing, which does not mention the Jaguar. Rather, it is only evidence that Ralph finally acquiesced to performing one of the items on the "to-do list."

Ralph testified that he went to Attorney Schwary in late 1999, not to address implementation of the October 1999 writing, but to address updating his trust, because one of his children had not been born when the trust was prepared. Kathleen, on the other hand, testified that she and Ralph met with Attorney Schwary in late January or early February 2000, to discuss the implementation of the October 1999 writing. However, Kathleen's only citation to documentary evidence of contact with Attorney Schwary is a copy of a November 23, 1999 letter from him to Ralph. In that letter, Attorney Schwary addressed with Ralph the tax ramifications of his trust, and ways to change the trust to achieve tax benefits on his death. Kathleen does not explain how Ralph's consultation with Attorney Schwary with respect to tax issues on death constitutes a ratification of the provision of the October 1999 writing requiring Ralph to transfer to her a portion of his corporate stock or his share of the residence. Kathleen has not shown us how the trial court's implied finding that there was no ratification was erroneous.

### (6) *Agren Testimony:*

At trial, Kathleen testified that she did not have a temper. Attorney Agren, former counsel for Kathleen, also testified with respect to that assertion.[5] Attorney Agren's testimony pertained to an incident that took place on August 7, 2003, at the Lamoreaux Justice Center.[6] On appeal, Kathleen argues that the court abused its discretion in permitting Attorney Agren to testify as to the incident.

---

[5] According to Ralph, Attorney Agren was subpoenaed to testify.

[6] Attorney Agren and Attorney Michael Monarch, who represented Ralph, had reached an agreement as to a visitation issue and had resolved that Attorney Monarch would prepare a stipulation on the matter. On the morning in question, about 9:00 a.m., Attorney Agren and Kathleen were sitting on a bench outside the courtroom. Attorney Monarch approached the two of them, with the stipulation in hand. As Attorney Monarch approached, Kathleen said to him, "Get out of here." Under questioning by Attorney Monarch at trial, Attorney Agren testified that as Attorney Monarch started handing the stipulation to Attorney Agren, Kathleen "suddenly jumped up and grabbed the piece of paper very forcefully as it was being almost yanked out of your hand. She—and again I'm holding my hand up because I have this very strong visual. She shook the piece of paper in the air with her fist very close to your face. I recall you putting up both hands in a defensive manner, walking backwards. And I've had

At the time of trial, Kathleen's counsel objected to the testimony. Ralph's counsel argued that the testimony should be permitted for the purpose of impeaching Kathleen's assertion that she has no temper. The court overruled the objection, limiting receipt of the testimony to address the issue of credibility.

Kathleen does not explain why the testimony could not be admitted for this purpose. However, she asserts that the incident in question was irrelevant, as taking place years after the execution of the October 1999 writing, and was more prejudicial than probative. The incident was not irrelevant in terms of ascertaining whether Kathleen lied about having a temper. As for it being more prejudicial than probative, the trial was a court trial, not a jury trial, and we have confidence that the court was capable of considering the evidence for the limited purpose for which it was admitted. No abuse of discretion has been shown. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund.* (1998) 65 Cal.App.4th 1422, 1431 [77 Cal.Rptr.2d 574] [abuse of discretion standard on admission of evidence].)

### (7) *Evidence of Tape Recording:*

At trial, Ralph's counsel offered a transcript of a tape recording left on Ralph's answering machine some time after the dissolution proceedings were commenced. As the transcript showed, Ralph's son telephoned him and the answering machine picked up the call. However, the boy did not completely hang up the telephone. After he completed the message to Ralph, the boy, his sister and Kathleen had a discussion and the answering machine recorded that discussion. The transcript showed that Kathleen swore at the children, said the son could not talk to Ralph, and threatened not to let the daughter go to Ralph's house the next day. In addition, the tape recording purportedly showed that Kathleen was yelling at them.

---

other cases with you. Your eyes were very large. And you had an expression on your face of—looked stunned. I was stunned. I jumped up shortly after she did. And I said to her in your presence something like 'you're out of line. This is inappropriate. This is not going to be tolerated.' " Attorney Agren further testified: "I think agitated is an understatement, if you will, to describe her demeanor at that point." She also said that Kathleen looked "explosive" and "rageful" and that Attorney Monarch "looked very frightened." In addition, Attorney Agren testified that Kathleen "was shaking her fist, waving the piece of paper in the air, pressing forward. And you were backing up, again with your hands up, appearing to defend yourself. And I was concerned that there was going to be some kind of physical altercation; that there was—she was close enough to you that I thought she was going to hit you in your face with her fist." Attorney Agren concluded: "I would say again temper is an understatement for what I observed that morning." Kathleen testified that Attorney Agren was untruthful in her description of the event.

Kathleen's counsel objected to the admissibility of the transcript, on the ground of relevance. Ralph's counsel proffered that the transcript was admissible to impeach Kathleen's testimony on three points: (1) she never yelled at the children; (2) she never used profanities when addressing the children; and (3) she never interfered with their seeing Ralph. Ultimately, the court permitted the introduction of the evidence. According to the statement of decision, the evidence was admissible for the limited purposes of impeaching Kathleen's testimony and/or corroborating Ralph's testimony.

On appeal, Kathleen says that admitting the evidence violated the principles stated in *Estate of MacDonald, supra,* 51 Cal.3d 262. She also argues that the evidence of the discussion was "irrelevant, immaterial, remote, collateral and prejudicial to the limited determination before the court." She explains that the evidence puts her in a bad light while having nothing whatever to do with whether she exerted duress on Ralph in October 1999.

However, Kathleen has not explained why the evidence was not admissible for the limited purposes of impeachment or corroboration. As for her arguments, we first note that *Estate of MacDonald, supra,* 51 Cal.3d 262, having to do with the requirement under former Civil Code section 5110.730, subdivision (a) that a transmutation be made by express written declaration, is inapposite. Second, we are once again persuaded that, while it may sometimes be difficult for a jury to consider evidence for limited purposes, there was no jury in this matter. We remain convinced that the trial court is able to consider the evidence only for the limited purposes for which it is admitted.

While we agree that the transcript of the recording, made long after the execution of the October 1999 writing, is of little, if any, relevance, to duress or undue influence suffered in October 1999, we disagree that it was an abuse of discretion to admit the evidence for impeachment purposes under these particular circumstances. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund., supra,* 65 Cal.App.4th at p. 1431 [abuse of discretion standard].) Moreover, in the event of error, "the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.]" [Citation.]' [Citations.]" (*Id.* at pp. 1431–1432.) Given Ralph's credible testimony, it is unlikely the court would have ruled in favor of Kathleen even had it excluded the evidence of the tape recording for any purpose. Any error in admitting the evidence did not result in a miscarriage of justice. (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682 [76 Cal.Rptr.2d 691].)

(8) *Evidence of December 1999 Physical Abuse:*

At trial, the parties stipulated that Kathleen struck Ralph in the face in front of the children once, in December 1999. Although they had some

disagreement as to how to characterize the nature of the strike, i.e., a slap, a slug, or a punch, and whether Ralph used profanity either before or after Kathleen struck him, they certainly agreed that the striking took place in December 1999 in front of the children. The parties entered into the stipulation in order to avoid having the children called to testify.

On appeal, Kathleen says that the evidence of that event is irrelevant, because it occurred after the October 1999 writing was executed. She also contends that it was prejudicial. She does not mention the fact that she stipulated to the evidence and does not explain how she preserved a right to object to the evidence even though she stipulated to it. We may deem any objection she has to that evidence to have been waived. (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 346–347 [100 Cal.Rptr.2d 854].)

This notwithstanding, any error in admitting the evidence would not constitute reversible error in any event. Considering Ralph's testimony that Kathleen struck him from time to time, including beating her fists on his chest, prior to October 1999 and outside of the presence of the children, it is not reasonably probable that the court would have arrived at a result more favorable to Kathleen even without the admission of the stipulated evidence. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund., supra,* 65 Cal.App.4th at pp. 1431–1432.)

*(9) Adequacy of Statement of Decision:*

Kathleen filed a request for statement of decision in which she plied the court with 37 questions, some of which included subparts. The court filed a seven-page statement of decision in which it made seven findings and nine holdings. Most importantly, it stated the court's findings concerning undue influence and duress, and the evidence and reasoning underlying those findings. Kathleen nonetheless insists that the statement of decision was inadequate.

She notes that she had objected to the proposed statement of decision and "pointed out that the proposals [didn't] follow the inquiries and the requested legal and factual bas[es] [were] for the most part neither broached nor mentioned." In addition, Kathleen says that the statement of decision is inadequate to guide this court on review.

The trial court is not, however, constrained to provide a statement of decision addressing every single one of Kathleen's 37 questions. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230 [8 Cal.Rptr.2d 293].) Furthermore, its statement of decision was adequate for the purposes of this court's review.

As stated in *Hellman v. La Cumbre Golf & Country Club, supra,* 6 Cal.App.4th at page 1230: "In rendering a statement of decision under Code of Civil Procedure section 632, a trial court is required only to state ultimate rather than evidentiary facts; only when it fails to make findings on a material issue which would fairly disclose the trial court's determination would reversible error result. [Citations.] Even then, if the judgment is otherwise supported, the omission to make such findings is harmless error unless the evidence is sufficient to sustain a finding in the complaining party's favor which would have the effect of countervailing or destroying other findings. [Citation.] A failure to find on an immaterial issue is not error. [Citations.] The trial court need not discuss each question listed in a party's request; all that is required is an explanation of the factual and legal basis of the court's decision regarding the principal controverted issues at trial as are listed in the request. [Citation.]"

(10) *Motion for New Trial:*

Next, Kathleen claims that the court erred in failing to grant her new trial motion. In her motion, Kathleen primarily argued credibility issues. She asserted that the court erred in finding Ralph's testimony credible and her own testimony not credible. She also argued that the court should have found that Attorney Agren was a biased and untruthful witness. These are not issues we rework on appeal. Appellate courts "do not reweigh evidence or reassess the credibility of witnesses. [Citation.]" (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622 [34 Cal.Rptr.2d 26].) Put another way, "[t]he Court of Appeal is not a second trier of fact . . . ." (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021 [41 Cal.Rptr.2d 762].)

In her motion, Kathleen also complained that the testimony of Attorney Agren should not have been received and that the stipulated evidence regarding the December 1999 striking was irrelevant and prejudicial. She also argued that the evidence did not show that Ralph was under duress at the time he signed the October 1999 writing. Finally, she stated that the statement of decision was inadequate, resulting in reversible error. She rehashes these issues on appeal.

These are issues we have already addressed. They fare no better on appeal than they did before the trial court. The court did not err in denying the motion.

## III

## DISPOSITION

The judgment and the order denying the new trial motion are affirmed. Ralph shall recover his costs on appeal.

Sills, P. J., and Fybel, J., concurred.

A petition for a rehearing was denied September 7, 2006, and appellant's petition for review by the Supreme Court was denied November 15, 2006, S146669.