Filed 9/25/15  Coats v. Callaway CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SUSAN K. COATS,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HELEN CALLAWAY, Individually and as Trustee, etc.,<br><br>    Defendant and Appellant. | D068064<br><br><br><br>(Super. Ct. No. PRODS1000867) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Raymond L. Haight III, Judge.  Affirmed.


Martin & McCormick, John D. Martin and Kathy J. McCormick for Defendant and Appellant.

Alexandra S. Ward and Damian G. Garcia for Plaintiff and Respondent.

Helen Callaway[1] appeals a judgment ordering the return of properties to the Callaway Family Trust. She contends the court's statement of decision is inadequate and its judgment unsupported by substantial evidence, therefore requiring reversal. We disagree.

## FACTUAL AND PROCEDURAL BACKGROUND

Edna Callaway married Robert Blakey, Sr., in or around 1948. They had two sons, Robert and William. When Blakey was killed in the Korean conflict in 1951, Edna received veteran and insurance benefits from his death. In 1953, she used a portion of those benefits to purchase real property at 383 Badillo Street. Edna and her sons lived in the house on the front portion of the property and she rented out two bedrooms in the house on the back of the property. Edna met Donald Callaway after he started renting one of the back rooms. Shortly thereafter, Edna and Donald married and had one child, Susan K. Coats.

In 1959, Edna and Donald purchased real property at 416 Badillo Street using the remaining portion of the benefit money Edna received from Blakey, Sr.'s, death, as well as money from her savings, and from the equity in the 383 Badillo Street property. Donald joined in executing the grant deed to Edna "for the sole purpose of vesting title in his wife as her sole and separate property." His counsel now alleges he did this so the property would be safe from any lawsuits that might come against him through his business.

---

[1]     To avoid confusion, we will use first names for individuals who share the same last name.

Edna, Donald, and their three children moved into 416 Badillo Street, but continued to rent out the houses at 383 Badillo Street. In 1962, Edna's father died, leaving her a one-third interest in his real property at 624 Badillo Street with the remaining two-thirds interest divided among her siblings. Edna subsequently purchased the remaining interest from her siblings and took title to 624 Badillo Street, again with Donald joining in the execution of the deed simply "for the sole purpose of vesting title in his wife as her sole and separate property." Edna then began using 624 Badillo Street as another rental property.

During their marriage, Donald worked as an interstate truck driver, often remaining away from home for days at a time. Eventually, Donald became an intrastate truck driver. He bought a mobile home in Barstow, California, where he stayed during the week while completing his truck routes. He drove from approximately 1967 until his retirement in the late 1980's. Edna stayed home with the children and maintained and managed the rental properties at 383 and 624 Badillo Street. She later worked as a secretary for a local school district; however, she continued to manage the rental properties.

Edna and Donald kept separate bank accounts throughout their marriage. Edna had separate accounts for income generated from each of the rental properties and she deposited her wages and earnings into her own savings account. Donald similarly deposited his wages in his own account and used his separate account to pay for certain expenditures related to maintenance of the rental properties.

3

By 1984, Edna had completely paid off all loans on the three Badillo Street properties and obtained a full reconveyance of each. She intended for each of her children to inherit one of the three properties after she and Donald died. In order to memorialize this desire, Edna and Donald met with attorney Michael Newman in 1990 to establish the "Callaway Family Trust" (1990 Trust). Newman drafted the 1990 Trust so that its assets would be divided into three new trusts upon the death of the first spouse: the Survivor's Trust, the Family Trust, and the Marital Trust.

Pursuant to the terms of the 1990 Trust, the Family Trust and the Marital Trust were irrevocable and notably could not be dissolved or amended once the first spouse died. It also stipulated that upon the death of the surviving spouse, all remaining assets were to be divided equally among their three children. Newman inserted a clause that stated all property transferred into the trust was to keep its separate or community status upon transfer. Edna and Donald conveyed the three Badillo Street properties into the 1990 Trust as Edna's sole and separate property. Donald was made trustee.

Edna died in 1993. Donald alerted Newman of her death and met with him to discuss the 1990 Trust. Newman informed Donald that Edna's death triggered the division of the trust and that Donald was now required to convey the three Badillo Street properties into the Family Trust. Donald did not make the transfer, although he did appoint his daughter as the successor trustee. He continued to reside at 416 Badillo Street and managed the other Badillo Street rental properties.

In the late 1990's, Donald began dating Helen. Donald and Helen married in 2006. Shortly thereafter, Donald decided to amend the 1990 Trust so that he could provide for

4

Helen after his death. He met with attorney Keith Walker to request this amendment. Donald explained the creation of the 1990 Trust, gave Walker information about the Badillo Street property deeds, and told him the changes he wished to make. Walker informed Donald that Donald lacked authority to amend the trust because the properties seemed to be Edna's separate property. This information upset Donald, who believed the Badillo Street properties were community property. Walker prepared a petition in order to determine if any community property interest existed in the Badillo Street properties, giving Donald the ability to amend the trust. Donald never returned to sign and file the finalized petition.

Donald and Helen then set up a meeting with George Hoffman, hoping he could fulfill their desire to amend the 1990 Trust. Hoffman was not licensed to practice law in California. However, Hoffman often met and advised clients interested in estate planning. After hearing Donald's explanation of how the Badillo Street properties were acquired and reviewing the deeds to the properties, Hoffman concluded the properties had been transmuted to community property over the course of Donald and Edna's marriage and therefore Donald had the authority to amend the trust. Hoffman revoked the 1990 Trust in its entirety and created two new trusts: "The Edna F. Callaway Decedent Trust" (Edna Trust) and "The Donald L. Callaway Living Trust" (Donald Trust). The Badillo Street properties were divided equally among the two trusts. Donald made his three children the beneficiaries of the Edna Trust and Helen the beneficiary of the Donald Trust.

Donald passed away in 2009. As trustee of Donald's estate, Helen transferred the assets from the Donald Trust to herself. When Coats and her brothers inquired about the 1990 Trust and its assets, they learned of Donald's revocation of the 1990 Trust and Helen's acquisition of half of the Badillo Street properties through the Donald Trust. This information upset the children because the Badillo Street properties had been promised to them many times throughout their lives. Coats subsequently filed suit against Helen—individually and as trustee of Donald's estate—asserting numerous claims, including breach of trust and undue influence.

A 10-day bench trial took place in July 2012. After hearing the evidence and arguments by counsel, the court issued its findings in a written document titled, "Statement of Decision."[2] The court found the Badillo Street properties to be Edna's separate property and ordered Helen to return to the 1990 Trust the property interest she received through the Donald Trust. Helen submitted objections to the written findings, which were subsequently heard and denied. Judgment was entered in October 2013. Helen filed a timely notice of appeal.

## DISCUSSION

### I

### *Statement of Decision*

After a bench trial, the court must provide its tentative decision to the parties. (Cal. Rules of Court, rule 3.1590(a).) Within 10 days of this decision, "any party that

---

[2] The Honorable J. Michael Welch heard the evidence and authored the statement of decision.

appeared at trial may request a statement of decision to address the principal controverted issues."  (*Id.*, rule 3.1590(d).)  The court is only *required* to issue a statement of decision if a party requests it do so.  (Code Civ. Proc., § 632.)[3]  A party has 15 days after a statement of decision has been issued to file any objections.  (Cal. Rules of Court, rule 3.1590(g).)

The statement of decision is the "touchstone to determin[ing] whether or not the trial court's decision is supported by the facts and the law."  (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718 (*Slavin*).)  It also allows an appellant to avoid the doctrine of implied findings, which presumes a reviewing court will infer that a trial court made all factual findings necessary to support its decision.  (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).)  However, this presumption is only rebutted if a statement of decision is requested *and* objections as to any ambiguities or omissions in the decision are timely filed.  (*Ibid.*)

A.     Waiver

Neither party in this case requested a statement of decision nor did they direct the court on which issues to address in its written decision.  Coats contends that for this reason, Helen waived any objections to deficiencies in the court's findings.  In order for Coat's contention to be correct, we would need to treat the trial court's written findings as merely a tentative decision—one that required a formal request by the parties to become a statement of decision pursuant to section 632.  However, where a trial court issues a

---

3     All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

7

"lengthy and detailed statement which it specifically entitle[s] 'Statement of Decision,' . . . the court . . . clearly intend[s] that written decision be a statement of decision under . . . section 662." (*In re Marriage of Rising* (1999) 76 Cal.App.4th 472, 476, fn. 7 (*Rising*); see *Slavin, supra,* 25 Cal.App.4th at pp. 718-719.) We agree with this reasoning and, therefore, will treat the court's written findings in this case as a formal statement of decision.

While treating the court's written findings as a formal statement of decision fulfills Helen's requirement under section 632, she was still required to file timely objections to the statement of decision in order to preserve any issues with the decision on appeal. (See § 634.) Helen's objections were untimely.[4] Therefore, she has waived on appeal any objections regarding ambiguities or omissions in the statement of decision. The doctrine of implied findings stands: this court will presume the trial court made all necessary factual findings to support the judgment, so long as substantial evidence supports those findings. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

B.      Adequacy

Even if Helen had timely objected to the statement of decision, we find her objections lack merit. Helen contends the statement of decision is inadequate for three reasons: the findings were contrary to the record; the findings were based on matters

---

[4]      Helen filed a stipulation allowing her until November 26, 2012, to file any objections to the statement of decision. She did not file her objections until December 10, 2012—36 days after the court issued its statement of decision.

8

outside the record; and the findings failed to set forth a factual and legal basis for refusing to apply the *Moore/Marsden* rule (Rule).

A statement of decision is adequate if it provides a factual and legal basis for the decision in regard to the material issues in the case. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 45-46.) Any conflict in the evidence or "reasonable inferences to be drawn from the facts" will be resolved in support of the court's decision. (*Id.* at p. 46.) A statement of decision only needs to include ultimate findings, *not* evidentiary facts. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*).)

Here, most of Helen's objections to the statement of decision are based on her contention that the court's findings were contrary to the record. However, all of the evidence she provides to support this contention is contrary to the evidence the court used to support its decision. She does not refute the evidence the court relied on, but instead merely provides alternative evidence she believes the court should have relied on in making its findings.

Appellate courts do not " 'reweigh evidence or reassess the credibility of witnesses.' " (*Balcof, supra*, 141 Cal.App.4th at p. 1531.) It is not the job of this court to decide if the trial court based its findings on the *best* evidence. We only determine if the decision was based on *substantial* evidence. (See *ibid.*) In this case, the statement of decision gave lengthy and detailed evidentiary support for the court's findings. It is clear the language and scheme of the 1990 Trust was very important to the decision. The court determined from this, as well as the testimony of Coats and her brother William, that the

9

"clear intent of Edna and Donald was to pass the properties . . . to the three children." This intent was established many years prior to Helen entering Donald's life and the trust was set up so that the surviving spouse could not erase this long-standing intent years after the first spouse's death. The court also explained that its decision relied heavily on the testimony and actions of attorneys Newman and Walker, who both told Donald he did not have the authority to change the trust.

In addition, the statement of decision specifically discussed the evidence Helen contends should have been used to support the findings, namely, Edna and Donald's tax returns. The court spent over a page of its decision discussing the tax returns and came to the conclusion that this evidence was "really not that convincing." The court articulated that while it agreed with Helen that the tax returns show several years of net losses on the rental properties, the court found the returns did not, by themselves, support the presumption that the properties therefore could not pay for themselves and required supplemental income from Donald. The court explained this was simply too big of a leap to make, since many other inferences could be drawn from the same evidence. The court also stated it was "noteworthy that there was no real evidence to overcome the presumption of title."

Based on the statement of decision and the record in this case, we conclude there is substantial evidence in the record to support the court's findings. The statement of decision is adequate in that it addresses all material issues and gives a sound legal and factual basis for all its conclusions. Helen's contentions that the findings are contrary to the record amount to nothing more than a second "bite" at the proverbial "apple"—an

10

attempt to get this court to reconsider her evidence as opposed to that which supports the judgment. (*Fladeboe, supra,* 150 Cal.App.4th at p. 48; see *Balcof, supra,* 141 Cal.App.4th at p. 1531.) This we cannot and will not do, as it would defeat the purpose of requiring a party to object timely to omissions or ambiguities in the statement of decision. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

II

*Community Property*

Real property is subject to the form of title presumption, which provides "the owner of the legal title . . . is presumed to be the owner of the full beneficial title." (Evid. Code, § 662.) While property acquired during marriage is usually presumed to be community property, this presumption " 'has no application . . . where "a different intention is expressed in the written instrument." ' " (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 186.) " 'Where one spouse takes title to property in his or her name, without reference to the marital relationship or the other spouse, it is presumed that the property is the separate property of the spouse who holds title.' " (*Id.* at p. 185.) The form of title presumption can only be rebutted by clear and convincing proof that the title is other than as stated in the deed. (Evid. Code, § 662.) The mere fact that property is acquired during marriage does not rebut this presumption. (*In re Marriage of Brooks & Robinson,* at p. 186.)

Based on the record and the trial court's findings, we conclude Helen provided insufficient evidence to rebut the form of title presumption. The only evidence Helen proffered to rebut this presumption was that Donald told Hoffman that he and Edna

11

"agreed verbally to continue the community property aspects of their ownership interest" despite transferring the legal title to Edna as her sole and separate property. However, the court specifically stated in its statement of decision that it did not believe Hoffman's testimony because he had "no understanding of the law and facts of this matter." Because Helen failed to produce any further evidence to overcome the form of title presumption and because as a court of review we do not determine credibility (see *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364-365), we conclude the court properly found the presumption applied to this case and that Helen did not meet her burden in rebutting it.

A. *Moore/Marsden* Rule

Helen next contends the trial court should have concluded that Donald obtained a community property interest in the Badillo Street properties—regardless of the form of title presumption—under the Rule, which states " '[w]here community funds are used to make [loan] payments on property purchased by one of the spouses before marriage . . . "the community [obtains] a pro tanto community property interest in such property . . . ." ' " (*In re Marriage of Sherman* (2005) 133 Cal.App.4th 795, 799-800.) The Rule also applies when community funds are used to make improvements to property purchased before marriage, if such improvements increase the property's value. (*Id.* at p. 800.) However, the Rule does *not* apply to payments from community funds for tax or interest on such property, since these expenditures do not increase the property's equity value. (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 372 (*Moore*).)

While Helen correctly states the Rule in her brief, the evidence she provides is not applicable under the Rule. Helen relies heavily on the fact she produced evidence "that

12

established the Badillo Street properties were treated by Edna and Donald as community property assets." However, the intentions of the parties and their manner of treatment of the property are not relevant to the Rule's calculation of pro tanto community interest. (See *Moore, supra,* 28 Cal.3d at pp. 371-372.)

In addition, Helen cites to numerous service contracts and bills paid by Donald for maintenance of the Badillo Street properties. These payments are also inconsistent with the Rule because they do not provide evidence of *loan* payments or *improvements* made to the property; rather, they simply provide evidence that Donald helped with routine maintenance of the properties.[5] Helen also proffered evidence that Donald paid the taxes for the Badillo Street properties. As noted, the Rule does not apply to property tax payments. As such, we conclude that as a matter of law the Rule does not apply here and that Donald did not acquire a pro tanto community property interest in the Badillo Street properties.

B.    Substantial Evidence

Helen also contends that there is insufficient evidence in the record to support the court's finding that the Badillo Street properties are Edna's separate property and that the evidence she provided was sufficient to overcome the presumption of title relied on by the Trial Court. Helen's contention ignores our role as a reviewing court under the substantial evidence standard. " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the

---

[5]    Even *if* these payments were considered to be improvements to the properties, Helen provided evidence that Donald paid for these services from his *separate* checking account, not community funds, as required under the Rule.

13

power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957, 958.)  We must view the evidence in the light most favorable to the prevailing party, giving it the " 'benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' "  (*Id.* at pp. 957-958.)  Under this standard, the testimony of even one witness may be sufficient to sustain a finding.  (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 849.)

Here, the court's statement of decision and the findings therein provide sufficient evidentiary support that the Badillo Street properties were the sole and separate property of Edna.

## DISPOSITION

The judgment is affirmed.  Coats is awarded her costs on appeal.

PRAGER, J.*

WE CONCUR:

NARES, Acting P. J.

IRION, J.

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15