Filed 3/30/15  Camerlingo v. Camerlingo CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARIE V. CAMERLINGO,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL CAMERLINGO,<br><br>    Defendant and Appellant. | G049709<br><br>(Super. Ct. No. 30-2012-00588159)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David R. Chaffee, Judge.  Affirmed as modified, with directions.

Donna Bader for Appellant and Defendant.

Jarvis, Krieger & Sullivan and Charles T. Spagnola; Law Office of Stuart Miller and Stuart Miller for Plaintiff and Respondent.

*        *        *

Michael Camerlingo appeals from a judgment awarding his former spouse Marie Camerlingo $667,500 in damages for breach of a postmarital contract and $750,000 in punitive damages for his fraudulent and oppressive conduct.[1]  The trial court concluded Michael "essentially stripped away all of [Marie]'s share of the community assets through their approximately 25-year marriage through one scheme after another," including the postmarital contract.  Michael does not dispute he breached the contract, but argues the trial court erred in failing to offset several of his payments to Marie.  On the fraud claim, Michael challenges the sufficiency of the evidence to support the trial court's conclusion he did not intend to honor his contract with Marie at the time he entered it, and he contends the punitive damages figure is excessive because no evidence showed he had the ability to pay that amount.  As we explain, Michael is entitled to an offset of $60,000, but we affirm the judgment in all other respects.

I

FACTUAL AND PROCEDURAL BACKGROUND

As we explained in *In re Marriage of Camerlingo* (June 29, 2012, G046377) 2012 WL 2515979 [nonpub. opn.] (*Camerlingo I*) the litigation between the parties is unusual because it arises from Marie's claim the parties had only a "sham" divorce.  In *Camerlingo I*, Marie explained "she and Michael 'initiated a sham uncontested divorce proceeding' 'for the foolish reason of helping a relative in Vietnam.'  Specifically, '[Michael] and I jointly decided that the divorce would enable me to "marry" a distant cousin in Vietnam and bring him to this country legally.  [Michael] and I were both self represented in our divorce proceeding.  After the divorce was finalized, it was always our intention to remain living as husband and wife and eventually legally remarry.  It was a foolish and unethical decision to help our cousin in Vietnam and we

_____

[1]      Because the parties share the same last name, we use their first names to avoid confusion and we intend no disrespect in doing so.  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2 [same].)

2

luckily never completely went through with [it].  However, [i]n July . . . 2007, [Michael] and I were 'divorced' but continued to live together as man and wife.'"  (*Ibid*.)

The divorce decree incorporated their marital settlement agreement disavowing spousal support, which Marie signed because she believed Michael's repeated assurances they would remarry.  Michael, however, accelerated a pattern of plundering Marie's share of their assets.  In late 2005, before they divorced and while Marie was out of the country, Michael sold the couple's large, nearly mortgage-free Anaheim Hills home for more than a million dollars, along with all Marie's property in the home, including her jewelry, clothing, kitchenware, and a "very, very large library" of books.  Marie received less than 1% of the proceeds.  Michael also claimed to have "lost" her four-carat diamond during this time.

In November 2007, after their June 2007 divorce, Michael induced Marie to transfer the remaining $639,000 in her brokerage account to him.  According to Marie, at an unspecified point Michael also withdrew all funds from the couple's joint accounts and transferred them to separate accounts in his name.  In early 2008, Michael purchased a home in Corona without Marie's knowledge and when she discovered his subterfuge, he persuaded her to execute a quitclaim deed relinquishing any interest in the home.  He also purchased a home in Baldwin Park without telling her, and he purchased a textile business at the end of 2008.  Marie noted Michael "excluded me from ownership of the new business," but he assured her "all would be corrected upon us legally remarrying," and he introduced her as his wife to an escrow agent when he bought the business.  He also applied for a mortgage on the Corona home and another loan as a "married man," bolstering Marie's claim that he continued to hold himself out as her husband in business and family interactions.  She cooked and cleaned for him and did his laundry as the couple continued their semblance of married life.

Michael capitalized on Marie's belief they would remarry.  In 2008 while Michael secretly had been purchasing or planning to purchase his new business and two

3

new homes, Marie asked him to return her brokerage funds, but he became "very upset" and pushed her "out of the office door." He agreed in June 2008 to execute a promissory note to her for $500,000, but soon induced her to tear it up. Michael told her, "'[W]e're going to be married, but in order for us to do so, you need to show me that you trust me so I want you to tear up the promissory note if you want us to be married again.' So I did. I tore up the note." In late 2008, Marie discovered Michael was having an affair with a young woman from Vietnam, but when he assured her he was "just having a little fun," they reconciled and continued living together as man and wife.

In January 2009, Michael opened a small checking account for Marie's use to pay her living expenses, but he promptly liquidated it without telling her, causing her checks to bounce and leaving her with no money. By May 2009, Marie found Michael "unpredictable" and felt "he and I had to agree to something in writing." She agreed not to sue him for misappropriating or defrauding her of her share of their assets, and he agreed to pay her sums the two characterized as "support" for Marie. In addition to $80,000 he already had paid, Michael agreed to pay Marie $644,000, consisting of: (1) a lump sum of $140,000 due by June 1, 2009; (2) $30,000 in 12 monthly installments of $2,500 for the 2009 calendar year; (3) $50,000 per year for nine years beginning in December 2010, and (4) $24,000 in the 10th calendar year.

The agreement also required Michael to obtain and pay the premiums on a $500,000 life insurance policy with Marie as the sole beneficiary, and to prepare a will and create a trust consisting of all of Michael's real and personal property, with Marie as the sole beneficiary and their daughter as the sole successor beneficiary. The agreement provided that Michael "shall cause title to all assets to be either held in the name of this trust or in 'joint tenancy with right of survivorship' so that [Marie] and [their daughter] are each named as 1/3 owners with [Michael]." The agreement set a June 1, 2009, deadline for Michael to give Marie the original of the will, trust, and title documents.

4

Finally, the agreement also provided for $5,000 in attorney fees if Marie had to sue to enforce it.

The parties labeled their agreement as a "Stipulation" and filed it in November 2009 with the family court under the case number for their divorce proceeding. They apparently believed merely filing the document modified their divorce decree waiver of spousal support as calculated and enforced under the Family Code. Neither party requested an order to show cause (OSC) or a hearing or otherwise immediately sought to enforce their attempt to modify the divorce decree.

According to Marie, it was not until after she signed the agreement that she learned Michael had over $2 million in his brokerage accounts. Michael later claimed he lost nearly all of his assets and Marie's brokerage funds in stock market losses in 2009 and 2010. But he provided no documentation from his investment accounts or other records of these claimed losses, nor did he provide an accounting for the funds he invested in the two new homes and his new textile business in 2008.

Michael's promises of remarriage continued, even after he married a woman with whom he had been having an affair. In January 2010, Marie filed in the family court an OSC seeking to modify the stipulated agreement she and Michael had filed in the family court in November 2009. She sought interim "Guideline Temporary" support under Family Code provisions governing spousal support. The next month, in February 2010, she also filed a motion to hold Michael in contempt for failing to make his stipulated payments and failing to transfer title of his assets into a trust, as he had agreed.

The family court subsequently denied Marie's attempt to modify the November 2009 stipulation that the parties viewed as a modification of their waiver of spousal support in the divorce decree. The family court stated cryptically in its minute order denying Marie's modification petition that the "parties are bound to their agreement in both instances." As we explained in *Camerlingo I*, we inferred "this means the court

5

concluded the parties could not modify the [divorce] judgment to require spousal support under applicable Family Code legislation because they expressly waived support in their marital settlement agreement, which became part of the [divorce decree]. But the court's language suggests the parties nevertheless remained free to later reach binding contractual agreements with each other after the judgment, if they chose to do so." (*Camerlingo I*, *supra*, 2012 WL 2515979, *3.)

The family court in June 2010 similarly denied Marie's contempt motion because "this court does not have jurisdiction over the issue of support." Marie did not appeal or otherwise challenge the family court's modification or contempt rulings. Nevertheless, 15 months later she retained a new attorney who filed an ex parte application on Marie's behalf for a judgment debtor exam based on Michael's failure to comply with the stipulation filed in November 29, which Marie apparently still viewed as a modification of the divorce decree. Marie persuaded a different family law judge that the stipulation constituted "a valid court order" modifying the divorce decree, and therefore the court denied Michael's motion to strike the debtor exam.

On appeal, we granted Michael relief, explaining collateral estoppel barred the judgment debtor exam for lack of a valid underlying support order or money judgment, given the family court had denied Marie's spousal support modification and contempt motions. (*Camerlingo I*, *supra*, 2012 WL 2515979, *7.) We agreed with Marie that the original family court's observation that the parties were "'bound to their agreement in both instances' . . . suggested a measure of validity in the November 2009 stipulation." (*Ibid.*) But we explained: "[G]iven the court's denial of Marie's request to modify spousal support, the court could only have meant the stipulation was valid in a contractual sense, with the parties free to enter binding, postdissolution contracts with each other. As Marie puts it in her brief on appeal, 'If the stipulation does not modify the [divorce] judgment, it can stand alone,' presumably as an independent contract between the parties. The flaw, however, in Marie's position is that she never [to that date]

6

followed through and obtained a judgment for breach of contract. Therefore, given the absence of a valid support order or breach of contract or other money judgment, there was no basis for a different family court judge to later order Michael to appear for a debtor exam." (*Ibid.*) Consequently, we set aside the debtor exam, but noted, "Of course, our resolution of *this* appeal says nothing about whether Marie may have valid claims against Michael that *could* support a judgment." (*Id.* at *8, original italics.)

Thereafter, Marie filed the present action, alleging causes of action against Michael for breach of contract and fraud. After a two day bench trial, the trial court observed that Michael's "testimony was so evasive and so nonresponsive, his testimony changed frequently with respect to the variety of questions or with respect to evidence being put in front of him that demonstrated that what he had said was patently false, that the court must find that the defendant has no credibility whatsoever here." The court noted, "No evidence, by the way, supports the claimed investment [of Marie's money], let alone the supposed loss in the stock market. . . . It's simply a fiction, as is virtually all of defendant's other testimony."

The trial court found Michael breached the parties' May 2009 contract, i.e., the stipulation they had filed with the family court in November 2009. The trial court awarded Marie $667,500 in compensatory damages for Michael's breach of the contract, consisting of $644,000 in specified payments and $5,000 in attorney fees under the contract, plus $18,500 in insurance premiums to reimburse Marie for life insurance premiums that Michael was supposed to pay under the contract. The court granted Marie's request for specific performance on the life insurance and trust provisions of the contract, ordering Michael "to maintain the term life insurance policy . . . and that defendant create a will and trust naming plaintiff as the sole beneficiary to 100 percent of defendant's assets, and that the parties' daughter, Michelle, be named as the sole successor beneficiary." The trial court also found Michael committed fraud in entering

7

the contract because he never intended to honor it, and awarded Marie $750,000 in punitive damages. Michael now appeals.

## II

## DISCUSSION

A. *Offsets*

Michael does not challenge the trial court's finding he breached the May 2009 contract; instead, he contends only that the trial court failed to deduct offsets for certain payments he made under the contract. "'The amount of damages . . . is a fact question'" (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753), which we review under the substantial evidence standard. The "reviewing court must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment." (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

Marie contends Michael's offset challenge is forfeited because he did not "do a summary" of his alleged payments as the trial court requested, given the court did not want to proceed "check by check." Recognizing on appeal however that the trial court did not find Michael credible, he relies not on his own testimony but instead on Marie's acknowledgment that he made certain payments. Consequently, Michael's challenge is not forfeited because our substantial evidence review includes the whole record, not simply isolated snippets of evidence that favor the respondent. (*Estate of Young* (2008) 160 Cal.App.4th 62, 76; *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 50.) We may not ignore payments Marie acknowledged Michael made under the contract.

Michael is *not* entitled to an offset of $80,000 because although Marie through her attorney acknowledged Michael paid that amount, the couple's May 29 contract stated that Michael's $80,000 payment was distinct from his separate obligation to pay the specified sums in the contract that comprised the trial court's $667,500

8

damages award. Consequently, the trial court did not fail to account for the $80,000 and it may not be deducted from the damages award.

Marie *did* acknowledge Michael made four payments totaling $80,000 "as part of the $140,000" due on June 1, 2009 under the parties' May 2009 contract. Specifically, Michael gave Marie checks for $20,000 and $50,000 in October 2009, and two checks of $5,000 each in December 2009. While the checks were months late and not in full payment of the $140,000, Marie acknowledged she had received them as partial payment of the $140,000. Michael borrowed back $20,000 from Marie in October 2009, leaving a net sum of $60,000 he paid Marie under their contract. He is entitled to an offset of that amount against the trial court's $667,500 damage award, which did not account for the $60,000.

Marie claims the $60,000 in turn should be offset equitably by prejudgment interest substantially exceeding that amount, which she could have sought (Civ. Code, §§ 3287, 3289), but did not attempt to obtain because she was "satisfied" with the trial court's damages award. Marie offers no authority to support her claim for an offset based on interest the trial court was never asked to award. In effect, she simply assumes she was entitled to the interest or asks us to adjudicate her interest claim, which we may not do in the first instance on appeal. There is no merit in Marie's challenge to the $60,000 offset.

Michael is not entitled to other offsets he claims on appeal. He engages in a curious calculation in which, relying on his claim that he lost in the stock market crash some 70 to 80 percent of the couple's assets, he surmises that between 20 and 30 percent (i.e., $127,800 to $191,700) of the $639,000 he obtained from Marie's brokerage account may have survived the crash. But he presented no evidence he restored those funds to Marie, so the novel offset claim he attempts to trace on appeal to those funds is misplaced. He also asserts for the first time on appeal that he was entitled under the parties' 2006 marital settlement agreement (MSA) to attorney fees of nearly $50,000 that

9

he incurred on appeal in *Camerlingo I*, which he claims we should offset against the trial court's $667,500 damages award. The trial court, however, adjudicated Marie's contract claims in her complaint, not claims arising under the earlier MSA. Michael points to nothing in the record suggesting he raised an offset claim for attorney fees under the MSA, and his assertion on appeal therefore fails. (See *People v. Partida* (2005) 37 Cal.4th 428, 435 [trial court does not err "in failing to conduct an analysis it was not asked to conduct"].)

The other offset claims Michael tabulates also fail. The vast majority of the checks for which he seeks credit on appeal preceded the parties' May 2009 contract, so there is no basis to offset those amounts against the trial court's award of damages under the contract. The few checks postdating the parties' May 2009 agreement, apart from the $50,000, $20,000, and $5,000 checks already accounted for, are in varying amounts from $2,000 to $3,600. Given the parties had frequent and extensive interactions together, in which they maintained a semblance of married life with an adult daughter and multiple homes they shared, it is no surprise that noncontract expenses may have arisen for which Michael reimbursed Marie. Notably, Michael did not testify or offer a summary as the trial court requested or otherwise claim that any of the checks were payments he owed under the May 2009 contract. Nor did Marie. Consequently, under the standard of review in which we must make every presumption in favor of the judgment, Michael is not an entitled to rewrite the judgment with an offset for these amounts.

B. *Fraud*

Michael challenges the sufficiency of the evidence to support the trial court's fraud finding. Civil Code section 1710, subd. (4) provides that fraud occurs when a party makes a promise "without any intention of performing it." Michael contends that because he made some belated payments on the contract, initially drafted a will that may have named Marie as his beneficiary, and created an unfunded trust, no evidence showed

10

that at the time he entered the contract he did not intend to fulfill it.  We are not persuaded.

We review the trial court's finding under the deferential substantial evidence standard.  (*Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1576.)  Under that standard, reversal of the judgment is not warranted even though the evidence might support a contrary finding.  Rather, "'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. . . . [T]his court is without power to substitute its own inferences or deductions for those of the trier of fact . . . .'  'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.'  [Citation.]" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.)

Michael is correct that breach of a contract alone is not sufficient to support a finding of fraud.  Instead, "'something more than nonperformance is required to prove the defendant's intent not to perform his promise.'  . . .  To be sure, fraudulent intent must often be established by circumstantial evidence.  Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his *hasty repudiation of the promise*, his *failure even to attempt performance*, or his *continued assurances after it was clear he would not perform* . . . .  However, if [the] plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance . . . , he will never reach a jury." (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30-31, italics added (*Tenzer*).)

Ample evidence supported the trial court's fraud finding.  Michael relies on the fact he "made payments to Marie *before* the May 29, 2009 agreement and *for over six months after* the parties executed their agreement." (Original italics.)  He argues this evidence precludes a finding "that he did not intend to perform at the time he executed

11

the agreement." But the trial court reasonably could conclude payments Michael made before the agreement shed little light on his intent to perform, given his past actions reflected an intent to take Marie's funds for his own purposes even if he sometimes made payments to her. Similarly, while Michael made four payments to Marie after the contract, they were months past their June first due date, incomplete, and Michael immediately borrowed $20,000 back from Marie. The evidence reflected an arbitrary disposition in which Michael gave Marie funds to subsist on only when he felt like it, according to his own caprice and not the contract.

Similarly, while Michael initially created a will, the evidence suggested he did not name Marie as his beneficiary as required by their contract, but instead a family trust that did not have Marie as the beneficiary. Nevertheless, he lied and told Marie he named her as his sole beneficiary, which the trial court could infer reflected a deceitful intent not to perform the contract. Similarly, while he created a trust as required by the contract, the trial court reasonably could conclude it was an empty, meaningless gesture because he never funded it or provided Marie the title documents as required by the contract. Moreover, almost immediately upon signing the contract with Marie, he eliminated Marie as a trust beneficiary and substituted his daughter by another marriage. At the same time, he also substituted the daughter as the beneficiary of his will.

Michael's testimony reflected a cavalier attitude toward his obligations under the contract, which the trial court could infer reflected he did not intend to fulfill it when he signed it. For example, in an exchange with the trial court, he initially denied he had created a will and trust naming Marie and her daughter as the beneficiaries, then stated, "Let's say that I did. Okay," to which the trial court responded, "No, let's not just say you did. I need to know as a matter of fact whether or not you did." Michael answered, "Okay, I did," but promptly admitted he changed the beneficiary of his estate to "[m]y other daughter." Michael testified he unilaterally changed the contract's terms

12

because he felt he "had the right" to do so since the agreement "was not really valid" and "I didn't really feel that I was bound by this stipulation."

Based on such testimony and Michael's arbitrary conduct, the trial court reasonably could conclude Michael lured Marie into a contract he never intended to honor. Based on the examples cited in *Tenzer*, Michael's "hasty repudiation of [his] promise" to name Marie as the beneficiary of his will and trust, "his "failure even to attempt performance" of critical contract terms such as funding the trust, and his "continued assurances after it was clear he would not perform" all furnished ample grist for the trial court's conclusion Michael held no regard for the contract at the time he signed it. (*Tenzer v. Superscope, Inc., supra,* 39 Cal.3d at p. 30.) Substantial evidence supports the trial court's fraud finding.

C.     *Punitive Damages*

Substantial evidence also supports the punitive damages award. Michael contends we must reverse the punitive damages award of $750,000 because there was no evidence of his financial liabilities or net worth. When a defendant's financial ability to pay is measured in terms of net worth, punitive damage awards in excess of 10 percent of a defendant's net worth are generally considered excessive. (*Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515; see *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [30 percent of net worth held "so greatly disproportionate . . . that [award was] presumptively based upon passion or prejudice"].)

Net worth, however, is not a definitive standard or even required, since that figure is easily manipulated. (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fn. 3.) In *Adams v. Murakami* (1991) 54 Cal.3d 105 (*Adams*), the Supreme Court held "meaningful" evidence of a defendant's financial condition is necessary to sustain an award of punitive damages and the burden rests on the plaintiff to introduce such evidence. (*Id*. at pp. 108-109.) Absent the evidence, there is no way to determine

13

whether an award is disproportionate to the defendant's ability to pay, and therefore excessive. (*Id.* at p. 109.) The purpose of punitive damages "is to deter, not to destroy." (*Id.* at p. 112.)

*Adams* was a personal injury case in which no "financial evidence of any kind" was introduced at trial. (*Adams*, *supra*, 54 Cal.3d at p. 116, fn. 7.) That is not the case here, where Michael's business partner, Ronald La Rosa, testified the commercial textile business in which he and Michael each had a 50 percent interest grossed more than $7 million in revenue the year before they acquired it in 2008, with $3 million in profit. La Rosa believed their gross profit remained above $3 million in 2012, and while Michael suggests no evidence was presented about his financial condition at the time of trial in mid-2013 (*Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777), La Rosa explained he expected a revenue base topping $7.7 million in 2013. Consequently, the trial court could infer a similar $3 million profit as in years past with $7 million in revenue.

Michael incorrectly suggests there was no evidence of his financial liabilities, and therefore, "[w]ithout knowing Michael's liabilities, neither the trial court nor this Court can answer whether the award falls within an acceptable level." To the contrary, however, La Rosa's testimony established that while the pair acquired their business with a Small Business Administration (SBA) loan of more than $2 million with their homes in Corona and Baldwin Park as collateral and they owed the seller $350,000 in a carryback loan, the monthly payments amounted to about $3,000 each, which fell within the bonuses they paid themselves. Michael also had put $300,000 in cash into acquiring the business, which he was entitled to on demand. He also owned a 50% share of La Rosa's $500,000 home in Baldwin Park, apparently unencumbered except by the SBA loan paid from their bonuses.

Notably, the trial court drew a connection between the thriving business with $3 million in profit and Michael's earlier fraud in which he "finagled" Marie's

14

$639,000 from her brokerage account. The trial court did not believe Michael had lost that money in the stock market, as he claimed. Rather, the court concluded, "There is plenty of evidence that post-investment [in the stock market, supposedly leading to Michael's stock losses] and later when plaintiff was seeking the return of her money, the defendant was buying and investing for himself [in] everything from real property to a business — a major business opportunity. And in this court's view these investments were being made not only with the defendant's money but also with the plaintiff's money." Michael complains that the trial court should not have considered Marie's direct claim for misappropriation of her $639,000 from her brokerage account because it was barred by the statute of limitations. Michael, however, did not object or move to exclude the evidence. Regardless, the trial court properly could consider the parties' prior dealings as the backdrop for their May 2009 agreement. Specifically, the court concluded Marie's forbearance in not suing Michael for the return of her $639,000 was more than adequate consideration for his promise in the May 2009 agreement to make payments totaling $644,000.

In any event, "[t]he fundamental underlying principle is that punitive damages must not be so large they destroy the defendant." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 625.) In light of the evidence of Michael's 50 percent share of annual profits of $3 million and his demonstrated capacity to attain that profit stream (*id.* at pp. 621-622), the trial reasonably could conclude a punitive damages award of half of Michael's share of a single year's profit would not "financially annihilate" him. (*Adams*, *supra*, 54 Cal.3d at p. 113.) On the evidence presented, the award was not excessive in relation to Michael's ability to pay. Adequate evidence supports the award.

III

DISPOSITION

The judgment is modified to reflect an offset of $60,000 on Michael's behalf (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533-535 [modifying damages on

appeal]), and affirmed in all other respects. The trial court is directed to enter a new judgment reflecting the offset. Each party shall bear their own costs on appeal.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.