Filed 9/6/24  Vanesyan v. Aperian CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LARISA VANESYAN, | B331463 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BD541888) |
| v. | |
| MAXIM APERIAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jeffrey W. Korn, Judge Pro Tempore.  Affirmed.

Law Offices of Cynthia A. de Petris and Cynthia A. de Petris for Defendant and Appellant.

Larisa Vanesyan, self-represented litigant, for Plaintiff and Respondent.

# I.  INTRODUCTION

Maxim Aperian (Maxim) appeals from an order denying his request for order (RFO)[1] to modify or terminate a permanent restraining order against him.  We affirm.

# II.  BACKGROUND

## A.  *Permanent Restraining Order*

Maxim and petitioner Larisa Vanesyan (Larisa) were married until their divorce in 2013.  On May 19, 2011, Larisa filed a petition for a domestic violence restraining order protecting her from Maxim; and, on August 9, 2011, the trial court granted the order, which was set to expire in two years.  Larisa subsequently requested that the restraining order be made permanent.  (Fam. Code[2], § 6345, subd. (a).)  On June 27, 2013, the trial court renewed the restraining order against Maxim and ordered it be permanent.  (See *In re Marriage of L.A. & M.A.* (B289451, Apr. 15, 2020) [nonpub. opn.].)  Among other things, the restraining order required that Maxim stay at least 100 yards away from Larisa's home, vehicle, job or workplace, and their children's school.

---

[1]  "In family law proceedings under the Family Code, the term 'request for order' (RFO) 'has the same meaning as the terms "motion" or "notice of motion" when used in the Code of Civil Procedure.'  (Cal. Rules of Court, rule 5.92(a)(1)(A).)"  (*In re Marriage of DeWolfe* (2023) 93 Cal.App.5th 906, 908, fn. 3.)

[2]  Further statutory references are to the Family Code unless otherwise stated.

2

B.    *RFOs to Modify or Terminate Restraining Order*

On September 30, 2021, Maxim filed an RFO to modify or terminate the restraining order.  On January 26, 2022, the trial court denied the RFO.  Maxim did not appeal from that order.

On March 14, 2023, Maxim filed another RFO to terminate or modify the permanent restraining order.  In his RFO, Maxim claimed that he had never "intentionally or maliciously violated the restraining order" but also admitted that he was found in violation of the protective order in 2015, and pleaded guilty to a misdemeanor.  Maxim also claimed that he was "ordered to complete all terms of probation, take 52 weeks of anger management classes, [and] take parenting classes . . ." Notwithstanding his admission of having been ordered to complete these requirements, Maxim also claimed that he completed the terms of probation "voluntarily."

In his attached declaration, Maxim claimed that he was pulled over and harassed by the police "all because of my Restraining Order."  Maxim attached a copy of his Driver's License information in support of his assertion.  That report, however, does not make reference to the existence of a restraining order.  Maxim also claimed that the existence of the restraining order prevented him from attending his brother's funeral, explaining that when he arrived at the airport to fly to Armenia, "some type of alert" was triggered, which caused him to be placed in a "suspended terrorist line."  Because "there were 22 people ahead of [him,]" he missed his flight.

Maxim also described his feelings about his divorce and Larisa.  He claimed that he could not "function properly at [his] work, due to the pressure and stress, given the process of divorce"

and was therefore laid off and ultimately became homeless. He claimed that all of his "financial institutions were seized and given to [Larisa]." He explained that he had a new girlfriend and believed that "LARISA is . . . purposely trying to make [his] life miserable, because [he] moved on." He stated that when Larisa advised the court that she had a "terminal illness," Maxim sent her a photograph of himself lighting a candle for her at a church, along with a message that stated he did not "wish [her] a death" and instead wished that she "would be happy and healthy." She responded, "Thank you so much! I'm so happy that you finally feel happy! Picture was not necessary." He also declared that he had sent Larisa Mother's Day greetings but that she did not respond and "simply ignored [him]."

Finally, Maxim submitted a letter from Dr. Richard Ciasca, dated February 27, 2023, who wrote that he had treated Maxim since 2015 and "[Maxim] does not pose a threat to anyone including the mother of his children."

Larisa responded to the RFO, asserting among other things that there was no material change of circumstances. She submitted a declaration in support, which stated that in July 2014, the superior court issued two criminal restraining orders against Maxim, protecting Larisa and the oldest child. And, in 2016, Maxim had been placed on a psychiatric hold after reporting to his doctor that he intended to kill Larisa. Larisa also reported that during court-ordered visits between Maxim and his youngest child in 2019, Maxim was aggressive and hostile towards Larisa, the child, and the monitor. Larisa submitted visitation reports prepared by the visit monitors, including one dated April 16, 2019, in which Maxim told the monitor, "[t]hat bitch made all of this, she is the one that doesn't want me to have

4

a relationship with [our daughter]." When the monitor requested that Maxim not speak about mother, Maxim responded, "I don't care, you could write everything down, I don't care. I will run her to the ground financially, I don't care if the fuck-en [*sic*] court knows it. She made the soup now she has to stir it and eat it." Larisa also declared that Maxim constantly followed her and knew when she and the children were far from home. He falsely reported to the police that she was neglecting the children, which resulted in investigations by the Department of Protective Services, which determined that the claims were unfounded. As a result, the police no longer responded to Maxim's reports. Finally, Larisa declared that on several occasions, Maxim appeared near Larisa's work. On those occasions, Larisa did not contact the police because she did not wish to have her clients involved in her personal matters. Instead, she had her friends stay with her in order to ensure her safety.

Maxim replied to Larisa's response, arguing that he never intentionally or maliciously violated the restraining order in the past 12 years and that he was no longer a "reasonable threat of future harm toward [Larisa]."

On May 11, 2023, the trial court conducted a hearing on the RFO. Both Larisa and Maxim testified. The record does not include a reporter's transcript of those proceedings, or a suitable substitute, such as an agreed or settlement statement, of the hearing. (Cal. Rules of Court, rule 8.120(b).)[3] The court denied the RFO.

---

[3] In his notice designating the record on appeal, Maxim elected to proceed without a record of the oral proceedings. Contrary to Maxim's assertion, the court's statement of decision is not a suitable substitute for a reporter's transcript. (See *Foust*

On July 5, 2023, the trial court issued a statement of decision. The court stated that the conduct that initially gave rise to the protective order was "severe and extended over time and included surveillance of [Larisa]. The abuse in this case was a course of conduct, not a single bad incident." The court further found that Larisa's testimony about her fear of abuse was credible and not objectively unreasonable. Maxim timely appealed.

## III. DISCUSSION

### A. *Standard of Review and Applicable Law*

"A domestic violence restraining order is a type of injunction, as it is an 'order requiring a person to refrain from a particular act.' (Code Civ. Proc., § 525 [defining an 'injunction'].) . . . Code of Civil Procedure section 533 sets forth the standards for a trial court to apply when considering whether to dissolve an

*v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186.) Further, we reject Maxim's request to stay proceedings so that he can secure a settled statement. (See Ct. App., Second Dist., Local Rules, rule 2(b) ["Appellant should file requests for augmentation in one motion within 40 days of the filing of the record or the appointment of counsel. . . . Thereafter, motions to augment will not be granted except upon a showing of good cause for the delay"]; *Russi v. Bank of America National Trust & Savings Assn.* (1945) 69 Cal.App.2d 100, 102 ["'Even where the matter sought to be added is proper, or the proposed correction is warranted, neither augmentation nor correction is a matter of right; they both may be denied for inexcusable neglect in preparing the record, for delay in presenting the application, or for other reasons'"].)

injunction. 'In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order.' (Code. Civ. Proc., § 533; see also *Luckett v. Panos* (2008) 161 Cal.App.4th 77, 85 [Code Civ. Proc., § 533 'articulates three independent bases on which a modification [or termination] of an injunction may be predicated—(1) change in the facts, (2) change in the law, or (3) ends of justice[ ]'].)" (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1503–1504 (*Loeffler*).)

"[W]here the party protected by a restraining order has *already* made the required showing to obtain a renewal of the order, and the restrained party later seeks to terminate the restraining order, the burden is on the restrained party to show by a preponderance of the evidence that one of the circumstances set forth in Code of Civil Procedure section 533 is present and justifies a termination of the restraining order." (*Loeffler, supra*, 174 Cal.App.4th at p. 1504.) "As in any review of an order denying a motion to dissolve an injunction, we apply an abuse of discretion standard of review." (*Id.* at p. 1505.)

B.    *Analysis*

Maxim contends that the trial court's finding that Larisa reasonably feared future abuse by Maxim is not supported by the evidence, and was based entirely on her testimony that she was

7

still "'afraid'" of Maxim. He also contends that the trial court was required to grant the RFO based on a change of circumstances because (1) Maxim was not represented by counsel at the hearing in 2013, when the permanent restraining order was issued, whereas he was represented by counsel for his RFO; (2) he did not further violate the protective order; and (3) his psychiatrist opined that Maxim did not pose a threat to Larisa. Finally, in Maxim's view, the trial court was required to grant the RFO because there was no reasonable risk that acts of domestic violence were likely to recur in the future.

Maxim cannot prevail on any of his arguments because he has failed to provide an adequate record on appeal. "[T]he absence of a court reporter at trial court proceedings and the resulting lack of a verbatim record of such proceedings will frequently be fatal to a litigant's ability to have his or her claims of trial court error resolved on the merits by an appellate court. This is so because it is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.] 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented.'" [Citation.] "'A necessary corollary to this rule is that if the record is inadequate

8

for meaningful review, the appellant defaults and the decision of the trial court should be affirmed.'" [Citation.] 'Consequently, [the appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' [Citation.]" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609, fn. omitted.)

Here, we do not have a record of Maxim or Larisa's testimony. The trial court, however, found Larisa's testimony about her ongoing fear of Maxim to be both credible and reasonable. We do not disturb this finding on appeal. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) Moreover, we have no record of what, if any, other evidence was admitted. Accordingly, although Maxim contends that his psychiatrist's letter required the granting of the RFO, we have no record of whether the letter was admitted into evidence, excluded as hearsay, or, if admitted, whether it was deemed either probative or credible by the trial court. We therefore reject each of Maxim's arguments.

## IV.  DISPOSITION

The order denying the RFO to modify or terminate the permanent restraining order is affirmed.  Larisa is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.

DAVIS, J.*

---

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.