Filed 10/10/25  Marriage of Gurvitz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of JENNIFER and JOSEPH GURVITZ. | B334203 |
| | (Los Angeles County Super. Ct. No. BD617345) |
| JENNIFER GURVITZ, | |
| Respondent, | |
| v. | |
| JOSEPH GURVITZ, | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Dianna Gould-Saltman, Judge.  Affirmed.

Holstrom, Block & Parke and Ronald B. Funk for Appellant.

Law Office of Leslie Ellen Shear, Leslie Ellen Shear and Julia C. Shear Kushner for Respondent.

# INTRODUCTION

Joseph Gurvitz appeals from an order denying his motion under Family Code sections 2121 and 2122, subdivision (c),[1] to set aside a stipulated judgment that dissolved his marriage to Jennifer Gurvitz.[2] Joseph argues the family court erred in refusing to issue a statement of decision, in making various evidentiary rulings, and in failing to find he signed the stipulated judgment under duress. We conclude that the court's failure to issue a statement of decision was harmless, that errors in the court's evidentiary rulings were also harmless, and that Joseph did not meet his burden to show duress. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *Jennifer Files a Petition for Dissolution*

Jennifer and Joseph married in February 2003. They have three children together: 21-year-old A., 19-year-old C., and 15-year-old D. In March 2015 Joseph was arrested on domestic violence charges, and Jennifer filed a petition for dissolution of the marriage. Joseph pleaded no contest to two misdemeanor charges, and the court issued a criminal domestic violence restraining order. In March 2016 the family court issued a civil

---

[1]     Undesignated statutory references are to the Family Code.

[2]     We refer to the various members of the family by their first names to avoid confusion. (See *In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1567, fn. 1; *In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 523, fn. 1.)

domestic violence restraining order in the marital dissolution action.

B. *The Family Court Orders Joseph To Pay Temporary Child and Spousal Support*

In April 2016 Jennifer filed a request for temporary child and spousal support. Jennifer alleged that, during the marriage, "Joseph was always negotiating and investing in multi-million dollar companies, on his own or on behalf of one of his and his father's companies." Jennifer alleged that Joseph had $30,000 to $50,000 in monthly income and significant assets in foreign bank accounts and that he falsely stated the money that flowed through his accounts belonged to his father, Meir Gurvitz, not him. She also alleged she learned through discovery that in 2011 Joseph borrowed $2 million secured by a deed of trust on the family's home (the June Street property) and transferred the money to his father's company. Jennifer submitted evidence that, between August 2013 and February 2015, Meir transferred nearly $600,000 into one of Jennifer and Joseph's bank accounts and that they used that money to pay household expenses.

Joseph contended that the transfers from Meir were loans, not gifts, and that Meir wanted Joseph to repay him. Joseph also contended Meir told Joseph he would no longer support Joseph or his family. Joseph claimed that, though the June Street property was purchased in Joseph's name, Meir paid for it, Meir's company Freshbrook Ltd. held a deed of trust on the property, and Jennifer quitclaimed any interest in the property.

While the dissolution action was pending, Freshbrook filed a civil action against Jennifer and Joseph to enforce its loan and deed of trust on the June Street property. Jennifer filed a cross-

3

complaint to cancel Freshbrook's deed of trust and to quiet title. In March 2016 the superior court found the civil lawsuits were related to the dissolution action. In July 2016 the family court joined Meir and Freshbrook to the dissolution action as indispensable parties.

In July 2016, following a three-day evidentiary hearing, the family court ordered Joseph to pay Jennifer $1,602 in temporary monthly child support and $827 in temporary monthly spousal support. The court found Joseph received $2,500 in monthly income from Meir for living expenses. The court rejected Jennifer's claim Joseph earned significantly more, finding the "evidence showed more persuasively that it was in fact Meir who was acting behind the scenes to move the money in and out of the accounts in Joseph's name—for whatever reason—but not Joseph himself earning the money." The court also stated that, though Joseph claimed the funds he received from Freshbrook were loans Meir intended Joseph to repay, Joseph did not provide documentation evidencing any loans.

C.     *The Parties Reach a Settlement*

In July 2017 Meir and Jennifer's mother, Sheryl Mandelbaum (an attorney who at times represented Jennifer), met and agreed to an outline of a settlement agreement. Joel Seidel, who represented Joseph in the divorce litigation, drafted a deal memorandum based on the terms Meir and Sheryl agreed to and sent it to counsel for the other parties. In September 2017 Jennifer, Joseph, Meir, and Freshbrook signed the deal memo. The settlement awarded the June Street property to Jennifer, free of encumbrances from Freshbrook's liens, but subject to a $2 million loan secured by a deed of trust held by a bank. The

4

settlement required Jennifer to sell the June Street property as soon as practicable after March 31, 2018 and to be responsible for all sales costs, property maintenance costs, loan payments, taxes, and insurance costs incurred before the sale. The settlement gave Jennifer the net proceeds from the sale, except for an equalizing payment of $675,000 to Joseph. Of that amount, $75,000 would be paid to Jennifer for Joseph's support arrears, and the remaining $600,000 would be deposited into an account to pay Joseph's future child support obligations. The parties agreed that Joseph would not be responsible for the children's private school tuition and that Jennifer would give up her rights to a piece of property in Israel.

Jennifer received sole legal and physical custody of the children. She agreed to ask the family court to dismiss the restraining orders against Joseph and to execute documents necessary to help Joseph obtain a visa to return to the United States. Joseph agreed to give Jennifer an unconditional "*get*."[3] The settlement also included mutual waivers of spousal support, and the parties agreed to bear their attorneys' fees and costs. Jennifer and Joseph agreed to select an expert to assist in creating a visitation plan for the children. The parties represented they were executing the agreement "freely and voluntarily and have had sufficient time to consider all terms and conditions and to confer with their attorneys throughout the negotiation process."

---

[3]     A *get* is a "Jewish bill of divorce." (*S.B.B. v. L.B.B.* (N.J. Super. Ct. App. Div. 2023) 476 N.J. Super. 575, 584.)

5

D.     *The Family Court Enters a Stipulated Judgment*

The parties submitted a proposed stipulated judgment signed by Jennifer, Joseph, Meir, Freshbrook, and their attorneys.  After hearing the parties' testimony, the family court denied the request to dissolve the civil restraining order five months before it was due to expire.  At the request of counsel for Joseph, the court agreed to give Joseph 10 days to decide whether to proceed with the stipulated judgment despite the court's refusal to dissolve the restraining order.  When Joseph did not object after 10 days, the court signed and entered the stipulated judgment in March 2018.

E.     *The Family Court Denies Joseph's Motion To Set Aside the Judgment, and We Reverse*

In March 2019 Joseph filed a motion to set aside "portions, or in the alternative, the entirety" of the deal memo and the stipulated judgment.  Joseph claimed he agreed to a "manifestly unjust" settlement "under duress" due to "extreme pressure and fear tactics" by Jennifer and her mother.  Joseph asked the court to award him all or, in the alternative, half of the proceeds of the sale of the June Street property.

In May 2019 the family court held a hearing on Joseph's motion.  The court denied Joseph's request to conduct an evidentiary hearing and denied his motion to set aside the judgment.

We reversed.  We held the family court abused its discretion in refusing to hear live testimony at an evidentiary hearing.  We stated "the family court should have heard and assessed Joseph's live testimony about the effect of the alleged threats on his state of mind, as well as heard and assessed the

6

live testimony of the other witnesses." (*In re Marriage of Gurvitz* (July 21, 2021, B300198) [nonpub. opn.].)

   F.    *The Family Court Holds an Evidentiary Hearing on Joseph's Motion To Set Aside the Judgment*

In August 2023 the family court held a four-and-a-half day evidentiary hearing. Joseph testified that, after he and Jennifer married in 2003, they lived in London and he worked for his father's company. After Joseph and Jennifer moved to Los Angeles in 2013 Joseph did not work, and Meir paid for Joseph and Jennifer's expenses. Joseph testified that, after Jennifer filed for dissolution, her family and members of the Jewish community pressured Joseph to get Meir to fund a settlement. When Jennifer's mother, Sheryl, served Joseph with the petition for dissolution of marriage, she said the dissolution action would "go away" if Joseph got Meir to agree Jennifer would get a half-interest in the June Street property.

Several witnesses testified Sheryl threatened to expose financial wrongdoing by Meir. Steven Formaker, Meir's lawyer, testified that Fred Fenster, who represented Jennifer in the civil action, told Formaker that Sheryl had commissioned an investigation into Meir's financial affairs and that, if Meir did not fund a settlement, Sheryl would release a report showing Meir had engaged in tax fraud and money laundering. Meir testified Formaker told him in December 2016: "[Jennifer's parents] took an investigator to look into my worldwide businesses. And this report shows that all I'm doing is laundering and tax evasion. And Sheryl Mandelbaum will not hesitate to go to the authorities in Israel, in England, wherever I have companies to make sure that I'll be investigated and prosecuted." Meir stated: "They said

7

again that I should let go of June Street property to [Jennifer]." Meir also testified that, during his deposition, counsel for Jennifer asked him questions about whether he was laundering money by transferring funds to his daughter's account.

Seidel testified he received the same threat from Fenster while the parties were waiting for the family court's decision on Jennifer's request for spousal support. Seidel testified Fenster said that, "if this case didn't settle," Meir could "be facing . . . jail time. Issues of tax evasion. Those sorts of things."

Joseph testified that an individual named Brian Dror approached him on behalf of Jennifer's family to discuss settlement. Joseph attended a meeting with Dror and Jennifer where Dror put a gun on the table and said, "I have to be in this meeting here with this weapon."

Joseph also testified that, while he was sitting in a restaurant in January 2016, he saw Robert Rechnitz, a friend of Jennifer's family, sitting with Jennifer's aunt and uncle. Rechnitz approached Joseph's table, sat down next to Joseph, and put his arm around him. According to Joseph, Rechnitz "was trying to talk to [him] and help the divorce case." Joseph said that the case was "extremely complex," that his father and attorneys were involved, and that he did not think there was anything they could discuss. Rechnitz got up, started walking away, and "all of a sudden turned back, turned around, came right towards" Joseph and hit him. Joseph stated Rechnitz "shoved his whole body on top of" Joseph, "started strangling [him] with both hands," and said "give her a fucking *get*, or I'll throw you out of this window and you're a dead man, literally." Joseph testified he saw Jennifer and her parents "driving on the street to the side of the restaurant."

Joseph testified that he deposited a *get* with a *beit din*[4] in 2015 and that he received a document certifying that the *get* was valid, but that Jennifer did not pick it up.  Jennifer, for her part, testified she never refused to pick up an unconditional *get*.  She testified the *get* Joseph got would not allow her to remarry because it was from an unrecognized *beit din*.

Joseph testified the Jewish community shunned him.[5]  He testified that in Los Angeles "the entire community would walk to the other side of the street when they saw [him]."  The president of a synagogue (a friend of Jennifer's family) told him to leave, "spoke about [the] *get*," and said, "You're never going to see your kids."  At another synagogue a relative of Jennifer's put his hand on Joseph's back and said "fucking get out" and "you're a dead man."  In Israel someone asked the rabbi to throw Joseph out of the temple, and at a synagogue Joseph and Jennifer founded in England, the rabbi asked Joseph to leave.

Meir testified that, after his deposition, Sheryl said, "We have to talk."  Sheryl was crying and said her husband was depressed and "about to die any day."  Meir agreed to meet

---

[4]     A *beit din* is a rabbinical court.  (*Schneider v. Schneider* (2011) 408 Ill.App.3d 192, 194.)

[5]     The parties agreed the "shunning" Joseph described was caused by the community's perception he wrongfully refused to get Jennifer a *get*.  Counsel for Joseph argued "there were false claims about [Joseph] not putting forward a *get* to put pressure on Joseph to settle the case.  In other words, to have him shunned in the community."  Jennifer, in contrast, argues that Joseph "refused to provide an unconditional enforceable *get*" and that "shunning a husband who withholds a get can be a religious obligation."

9

Sheryl for lunch the next day to try to reach a settlement. During the lunch meeting Sheryl told Meir that, if her husband died, she would "take revenge" and "make sure" that Meir's daughter got divorced and that Meir's wife left him. According to Meir, Sheryl said, "I'm a lawyer. You know, I know a lot about you. And I know some people you might not be aware of. And if you think that your son is slandered all over, . . . you're going to be the same as your son. I know how to do it. You won't be able to show your face in London, in Israel, or anywhere." Meir told Joseph about the meeting and said, "We have no choice. It's either me dead or in jail or even investigated." Meir told Joseph they had to agree to Sheryl's "request to give the June Street property" to Jennifer. Meir also testified that in 2017 his health was poor and that he had a "heart problem and a lung problem."

Joseph testified Meir called him after meeting with Sheryl and sounded "extremely out of breath," "threatened," and "petrified." Meir told Joseph: "They got us. They have a gun to our head." Meir said: "They're going to kill me. The pressure is getting to me. . . . If we don't give her June Street, I'll either die [or] you'll visit me in jail. They want to take the whole family down. They're on a rampage." Joseph testified that Meir was applying to become a permanent resident of the United States and that Sheryl's threats regarding tax evasion "could ultimately result in him being kicked out of the country."

Joseph testified he signed the deal memo in August 2017 and the judgment in December 2017 because he was "petrified to go to a restaurant in Los Angeles or to a synagogue," and because he was worried he would end up with "a dead father or a father in jail." Joseph stated that, when he filed the motion to set aside the judgment in March 2019, several things had changed: his

10

father had received his green card and his health had improved, and Joseph was frustrated he was not seeing his children.

### G. *The Family Court Again Denies Joseph's Motion To Set Aside the Judgment*

After Joseph rested Jennifer moved for an order under Code of Civil Procedure section 631.8 denying Joseph's motion to set aside the judgment. Counsel for Jennifer argued that Joseph had not connected any of the alleged threats to Jennifer and that Joseph agreed to the deal memo and the judgment freely and voluntarily. The family court granted the motion, so that Jennifer never presented her case. The court stated that it was "not persuaded that [Joseph] has been deprived of free will" and that it "has not found any evidence that directly ties any allegations of threats" to Jennifer. The court denied Joesph's motion to set aside the stipulated judgment, and Joseph timely appealed.

## DISCUSSION

### A. *The Family Court Erred in Not Issuing a Statement of Decision, But the Error Was Harmless*

#### 1. *Section 2127 Required the Court To Issue a Statement of Decision*

Joseph contends the family court erred in refusing to issue a statement of decision. Joseph argues that, because the court granted Jennifer's motion under Code of Civil Procedure section 631.8, the court was required to issue a statement of

11

decision and that Joseph filed a timely written request for a statement of decision under Code of Civil Procedure section 632.

The family court denied Joseph's request for a statement of decision because, according to the court, "a statement of decision is required only in the event of a trial, as that term is commonly understood," but is "neither required nor available upon decision of a motion." The court erred. First, to the extent the court granted Jennifer's motion under Code of Civil Procedure section 631.8,[6] the court had to issue a statement of decision. Code of Civil Procedure section 631.8, subdivision (a), provides that, if the court grants a motion for judgment and renders judgment in favor of the moving party, "the court shall make a statement of decision as provided in Sections 632 and 634," the statutes governing statements of decision. (See *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, 1181 [Code of Civil Procedure section 631.8 requires a statement of decision.].)

In any event, putting aside the Code of Civil Procedure, Family Code section 2127 required the family court to issue a statement of decision. That statute states: "As to actions or motions filed under this chapter [which includes sections 2121 and 2122], if a timely request is made, the court shall render a statement of decision where the court has resolved controverted

---

[6] Jennifer now says that, though her motion "was styled as brought under" Code of Civil Procedure section 631.8, it really wasn't under Code of Civil Procedure section 631.8 because "that statute governs only trials, not postjudgment evidentiary hearings." Joseph argues "Jennifer cannot avail herself of section 631.8 by requesting a ruling under its authority, while escaping the mandate it carries of a statement of decision."

12

factual evidence." (See *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1497, fn. 25 ["section 2127 specifically requires a trial court to provide a statement of decision when it resolves controverted factual evidence in ruling on a request for relief from a judgment"]; see also *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 294, fn. 11 [the "Legislature . . . has expressly required a statement of decision upon request in connection with particular rulings under the Family Code," including "relief from a judgment adjudicating support or property division"].)[7]

### 2. *But the Error Was Harmless*

A statement of decision must explain "the factual and legal basis for [the court's] decision as to each of the principal controverted issues." (Code Civ. Proc., § 632; see *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1106.) "One of its central purposes is to provide the reviewing court with the trial court's reasoning on disputed issues, thereby constituting the reviewing court's 'touchstone' to assess whether the trial court's decision is supported by the facts and the law." (*Alafi v. Cohen* (2024) 106 Cal.App.5th 46, 65.) "A trial court's failure to issue a properly requested statement of decision may effectively shield the trial court's judgment from adequate appellate

---

[7] Jennifer contends Joseph "forfeited the issue" by not citing in the family court "the proper code section" requiring a statement of decision. Jennifer cites no authority for the proposition a party who timely requests a statement of decision required by the Family Code forfeits the issue by not citing a specific Family Code section. Joseph timely requested a statement of decision; the family court, in denying that request, ignored the applicable code section.

13

review . . ." and "'may at times require reversal in order for the appellate court to effectively perform a review of the material issues.'" (*Monier*, at p. 1116.)

On the other hand, in "certain circumstances, even without a statement of decision, a judgment may nevertheless contain a satisfactory explanation of the trial court's reasoning." (*Alafi v. Cohen*, *supra*, 106 Cal.App.5th at p. 68.) That is the case here, where the family court's findings and order after hearing, combined with the court's oral ruling, sufficiently (albeit not extensively) explained the court's reasoning. (See *F.P. v. Monier*, *supra*, 3 Cal.5th at p. 1108 ["error in failing to issue a requested statement of decision is not reversible per se, but is subject to harmless error review"];[8] see also Cal. Const., art. VI, § 13 [no judgment shall be set aside unless "the error complained of has resulted in a miscarriage of justice"].)

In its findings and order the family court stated it was "not persuaded that [Joseph] was deprived of his free will when he entered the deal memo or the [stipulated] Judgment." The court also stated it had "not found any evidence that directly ties [Jennifer] to any of the threats alleged to have been made against" Joseph. The court said it was "impacted by the distance in time between the alleged threats and the date the deal memo and Judgment were signed by" Joseph. The court found that, though Joseph claimed he agreed to the settlement because he

---

[8]     Though in *F.P. v. Monier*, *supra*, 3 Cal.5th 1099 the Supreme Court held the failure to issue a statement of decision under Code of Civil Procedure section 632 was subject to harmless error analysis, we see no reason the Supreme Court's reasoning does not apply equally to the failure to issue a statement of decision under Family Code section 2127.

14

feared disclosure of his father's financial dealings, those dealings "were already a matter of public record long before the deal memo and the Judgment were entered." The court also found that "both parties meaningfully participated in negotiating the terms of the Deal Memo" and that "both the deal memo and the Judgment recited that each party entered into each such agreement freely and voluntarily and without duress." Finally, the court concluded other allegations, "such as the poor health of each [party's] father," were "the type of circumstances that would cause upset to most litigants and be stressful, but such stress did not rise to the level of duress" that "deprives either party of their free will."

The court further explained its decision at the hearing. The court stated that, "by December of 2016, some seven, eight months before the parties had the deal memo, the information about whether or not Meir had done something improper financially was already known. It was in pleadings." Therefore, the court found, Joseph's concern about disclosure of his father's financial improprieties was not "a basis for duress . . . seven or eight months later when he entered into . . . the deal memo." The court also found that neither Jennifer nor anyone on her behalf made the threats and that Joseph's concern his father might go to prison did not amount to "duress by [Jennifer] or anybody on [Jennifer's] side . . . ."

The family court adequately explained its ultimate adverse findings on Joseph's (only) claim: that he agreed to the settlement under duress. Duress occurs "'"where a party 'intentionally used threats or pressure to induce action or nonaction to the other party's detriment. . . .' The coercion must induce the assent of the coerced party, who has no reasonable alternative to

15

succumbing.""" (*In re Marriage of Diamond* (2024) 106 Cal.App.5th 550, 571; see *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1523.)  As discussed, the court found the threats against Joseph's father did not induce Joseph to agree to the settlement because, by the time Joseph agreed to settle, the threats had been publicly known for a significant time.  The court further found that, to the extent Joseph felt coerced by threats, those threats could not be attributed to Jennifer.  The court's findings adequately stated the reasons for the court's ruling on the main (if not only) issue.  (Cf. *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 770 ["A trial court's statement of decision need not address all the legal and factual issues raised by the parties; it is sufficient that it set forth its ultimate findings, such as on an element of a claim or defense."]; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 [ultimate fact "is a slippery term, but in general it refers to a core fact, such as an element of a claim or defense, without which the claim or defense must fail"].)

Joseph argues the court "never made a finding of whether the threats alleged by Joseph happened, or whether they amounted to wrongful coercion sufficient to overcome Joseph's free will."  But the court did make those findings.  The court found that, even if the threats occurred as Joseph (and his witnesses) described them, they were not tied to Jennifer, and Joseph was not "deprived of his free will."  Joseph also contends it was "unclear how the trial court weighed the credibility of key witnesses."  But the court did make credibility findings, some express, some implied, and in any event, credibility determinations are intermediate evidentiary facts the court does not have to include in a statement of decision.  (See *Muzquiz v.*

16

*City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125-1126 ["statement of decision properly set out the ultimate *facts* supporting" the trial court's decision the plaintiff did not prove her case; the court did not have to resolve "intermediate evidentiary conflicts"]; see also *Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 492 ["we defer to the trial court's implied finding of credibility"]; *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1318 ["statement of decision 'need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision'"].)

Joseph requested a statement of decision on 38 issues. He does not, however, identify any principal controverted issue the family court did not address. (See *F.P. v. Monier*, *supra*, 3 Cal.5th at p. 1116 ["the more issues specified in a request for a statement of decision and left unaddressed by a court's failure to issue one, the 'more difficult, as a practical matter, [it may be] to establish harmlessness'"].) Most of the 38 issues can be characterized as evidentiary facts, such as which individuals made what threats, whether the parties' attorneys had "substantive negotiations" over the deal memo or merely engaged in "word smithing," whether Joseph "benefitted financially" from the deal memo, and whether Joseph offered Jennifer an unconditional *get*. Because the court found the alleged threats did not induce Joseph to settle, the court did not need to resolve many of those evidentiary facts. And to the extent the court resolved "intermediate evidentiary conflicts" (*Muzquiz v. City of Emeryville*, *supra*, 79 Cal.App.4th at p. 1126) in concluding Joseph did not sign the stipulated judgment under duress, the family court did not need to address each piece of evidence the

17

court relied on.  (See *Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 265 [a statement of decision need not contain "a detailed discussion of all of the evidence *and* a discussion of why the court chose to credit some evidence while rejecting other evidence"]; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983 ["a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence'"]; *In re Marriage of Williamson, supra,* 226 Cal.App.4th at p. 1319 [family court "was not required to provide specific answers to" 147 questions in request for statement of decision, "so long as the statement of decision fairly disclosed its determination of these issues"].)

B.    *Any Error in the Family Court's Evidentiary Rulings Was Harmless*

1.    *Standard of Review*
We review a trial court's rulings on the admissibility of evidence for abuse of discretion.  (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 593; *Kourounian v. California Dept. of Tax & Fee Administration* (2023) 91 Cal.App.5th 1100, 1112.)  The "'judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial.'"  (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 293; see *Kourounian,* at p. 1112.)  We will reverse only ""'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'""  (*Kourounian,* at p. 1112; see *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 231.)  "It is the appellant's burden to

18

establish that the error was prejudicial." (*Bjoin v. J-M Manufacturing Co., Inc.* (2025) 113 Cal.App.5th 884, 900; see *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799.) An error in excluding evidence is harmless where the court admits the same evidence at another point in the proceeding. (See *People v. Ng* (2022) 13 Cal.5th 448, 553 [error in excluding testimony was harmless "because the evidence defendant now challenges was admitted through another witness"]; *People v. Harris* (2013) 57 Cal.4th 804, 846-847 [any error in excluding testimony was harmless where the jury heard evidence on the same issue]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480 [error in excluding letters was harmless where the trial court admitted witness testimony about a similar subject, allowing counsel to "clearly make his point"].)

### 2. *Any Error in Excluding Testimony About Threats Was Harmless*

Joseph attempted to introduce evidence Sheryl sent Formaker (Meir's attorney) a threatening message through Fenster (an attorney for Jennifer). Counsel for Joseph asked Formaker: "What was it that Sheryl Mandelbaum wanted conveyed to you?" The family court sustained Jennifer's hearsay objection.

The family court erred in sustaining this objection. Neither the statement by Sheryl to Fenster nor the statement by Fenster to Formaker was offered for the truth. The statements were offered to show they forced Joseph to settle so that his father would not be investigated or prosecuted. (See *People v. Boyette* (2002) 29 Cal.4th 381, 429 ["evidence of threats would not have

19

been barred by the hearsay rule, for such evidence would not have been offered for its truth . . . , but for a different purpose: to show the effect of the statements on defendant"]; see also *People v. Burgener* (2003) 29 Cal.4th 833, 869 [evidence the defendant threatened a witness was not hearsay because it "was not offered for its truth"]; *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 260 ["An out-of-court statement is not hearsay if offered to prove something other than its truth, for example to explain an action the recipient took in reliance upon it."].)

The family court's error, however, was harmless, because counsel for Joseph was able to get the same statement into evidence later in Formaker's testimony:

"Q: During your representation of Meir Gurvitz in these proceedings, was a threat conveyed to you?

A: Yes.

Q: And what was the threat?

[Counsel for Jennifer]: Objection. Hearsay. Foundation.

The Court: Sustained on foundation.

Q: Who conveyed the threat to you?

A: Fred Fenster.

Q: What was the threat?

[Counsel for Jennifer]: Objection. Hearsay.

The Court: Overruled. You may answer."

. . . .

"[Counsel for Jennifer]: He is about to repeat what Fred Fenster told him.

The Court: Right.

[Counsel for Jennifer]: How is that not hearsay?

20

The Court: Not necessarily for the truth of the matter. It's for the statement having been made. Whether true or false.

[Counsel for Jennifer]: But what would the exception be? It's hearsay.

The Court: It's the effect on the hearer. Not the statement being made."

In addition, Formaker testified Fenster told him Sheryl "had commissioned an investigation and had a detailed investigative report, which he claimed to have seen. . . . And he said that report detailed tax evasion and money laundering. And that if my clients did not contribute financially toward a settlement with Jennifer . . . of the divorce litigation, that the report would be released. And that the report would cause possible tax consequences, possible criminal prosecution, and embarrassment to Meir Gurvitz."

Joseph also argues the court erred in sustaining the following hearsay objection during his direct testimony:

"Q: And did it matter to you what the agreement said?
A: It did not matter to me.
Q: Why not?
A: I had no choice. I knew—my stepmother had called me also at some point to say they know your dad—
[Counsel for Jennifer]: Objection. Hearsay again.
The Court: Sustained."

The family court erred in sustaining this hearsay objection; the statement again was not offered for the truth. But the court's error was again harmless because the court later allowed Joseph

21

to testify extensively about threats against his father. For example, Joseph testified he heard "they were going to take my dad down and go after him for tax evasion and money laundering if the case wouldn't be settled or . . . Jennifer wouldn't get money or June Street. [If] she wouldn't get the house and—she wouldn't get the house and she wouldn't get money from my dad, they're going to go after him." Joseph also testified: "They were going after my dad for tax evasion. And they were mentioning money laundering. Just those words freaked me out."

Joseph also argues the court erred in sustaining a speculation objection to a question about the January 2016 threat by Rechnitz in the restaurant. Joseph's attorney asked Joseph on direct examination, "At any point do you think you saw Jennifer inside the restaurant?" The family court may have erred: The question did not really call for speculation; it pretty much asked Joseph what he saw. But again, any error was harmless because the evidence later came in. Joseph later testified that he did not know whether Jennifer was in the restaurant, that his friend "said he had seen someone who looked like Jennifer," but that Joseph did not see Jennifer in the restaurant.

> 3. *Any Error in Excluding Testimony Jennifer's Family Pressured Meir To Fund a Settlement Was Harmless*

Joseph argues the court erred in sustaining objections to two questions about Jennifer's family pressuring him to ask his father for money. First, counsel for Joseph asked Joseph whether, from 2013 to 2015, anyone in Jennifer's family was asking him "to ask for money from [his] father to pay expenses." Joseph said, "Yes." The family court sustained counsel for

22

Jennifer's objection under Evidence Code section 352 and struck the answer. Counsel for Joseph argued: "But it's our position that ultimately the actions were a conspiracy of Jennifer, her father, and her mother to put so much duress on Meir and Joseph, understanding that Joseph doesn't have money. It's Meir who has money." Any error in sustaining the objection to this question was harmless because Joseph later testified that, beginning in 2013, Meir paid for all of Joseph and Jennifer's living expenses.

In addition, Joseph testified:

"Q: Were people approaching you either in Los Angeles or anywhere else trying to settle the case?

A: Yes.

. . . .

Q: In terms of who would be financing the settlement, who were they—who were people referring to?

A: My dad."

Joseph also argues the court erred in sustaining a hearsay objection when his attorney asked him what Sheryl said when she served Joseph with the petition for dissolution of marriage. But the court later allowed Joseph to testify, over another hearsay objection, Sheryl said when she served him with the petition that, if Joseph would get his father "to write on a piece of paper . . . Jennifer will get 50 percent of the house on June Street, this would go away within six months."[9]

---

[9]     Joseph also argues the trial court erred in refusing to apply two exceptions to the hearsay rule, Evidence Code sections 1223 (statement by a co-conspirator) and 1250 (statement of the

23

4.     *Joseph's Other Challenges to the Family Court's Evidentiary Rulings Fail*

Joseph challenges sundry other evidentiary rulings by the family court, but he does not demonstrate the court erred.  First, Joseph argues the court erred in sustaining relevance and Evidence Code section 352 objections to questions his attorney asked Jennifer's father about paying for Jennifer to consult a family law attorney in London in 2009.  Counsel for Joseph argued he was trying to establish "divorce planning in the sense that Jennifer was already meeting with an attorney in 2009." The court ruled:  "It is so attenuated from duress that it has no relevance in this proceeding."  Joseph does not explain why the evidence was relevant, show the family court erred in excluding it, or explain how excluding testimony on such a tangential point prejudiced him.  (See *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 ["plaintiffs failed to carry their burden to affirmatively show error in the trial court's rulings on the evidentiary objections" where the plaintiffs' briefs did "not contain 'argument and citations to authority as to why the trial court's evidentiary rulings were wrong'"].)

Second, Joseph argues the court erred in sustaining a relevance objection when his attorney asked Meir whether he received a text message from his grandchildren in September 2017.  Counsel for Joseph argued Meir heard nothing from his grandchildren "after separation until September of 2017, which . . . goes to corroborate that outside of the threats

declarant's then-existing mental state).  Because the trial court erred in ruling the proposed testimony was hearsay, we do not reach whether the court erred in applying exceptions to the hearsay rule.  But the court's errors were still harmless.

themselves, there was also this statement . . . to him about the children becoming normalized into father's life." Joseph's offer of proof, however, did not say what Meir would testify the text message from his grandchildren said, much less how it was relevant. The court did not abuse its discretion. (See Evid. Code, § 354 [judgment or decision may not "be reversed, by reason of the erroneous exclusion of evidence unless" the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"]; *People v. Morrison* (2004) 34 Cal.4th 698, 724 ["Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence."]; *In re A.G.* (2020) 58 Cal.App.5th 973, 996 ["'"The offer of proof must be *specific* in its indication of the purpose of the testimony, the name of the witness, and the content of the answer to be elicited."'"]; *Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 329 ["'To preserve an evidentiary ruling for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony'"]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 ["the failure to make an adequate offer of proof in the court below ordinarily precludes consideration on appeal of an allegedly erroneous exclusion of evidence"].)

Third, Joseph argues the court erred in sustaining a hearsay objection when his lawyer asked Joseph what Rechnitz said about Jennifer's family "that concerned" him. Counsel for Joseph argued he was seeking to introduce the testimony to show Joseph's state of mind, not for the truth. But counsel did not make an offer of proof regarding what Rechnitz said. Therefore, we cannot determine whether the evidence was hearsay, whether

25

an exception applied, or whether the testimony's exclusion was prejudicial.

Fourth, Joseph argues the court erred in sustaining a hearsay objection when his lawyer asked him whether his daughter ever said anything during a phone call that concerned him. Joseph's lawyer argued that he was "not trying to [introduce] it for the truth of the matter asserted" and that "ultimately we'll tie it to the whole issue of duress." But again, counsel did not make an adequate offer of proof regarding the "substance, purpose, and relevance of the excluded evidence." (Evid. Code, § 354, subd. (a).)

Fifth, Joseph argues the court erred in excluding Joseph's testimony about the settlement terms Dror sought on behalf of Jennifer's family and about emails between Joseph and Dror. Counsel for Joseph argued the emails were admissible for a nonhearsay purpose: "And this email somewhat formulates what was being asked for very early on. It's really a state of mind issue moving through the proceedings." Joseph argues the settlement terms Dror requested "would certainly be relevant to Joseph's state of mind related to the duress issue." But Joseph did not make an offer of proof regarding what Dror said, nor does he explain what the excluded evidence was, why it was relevant to Joseph's state of mind, or why it is reasonably probable he would have obtained a more favorable result had the court admitted the evidence.[10]

---

[10] Joseph also argues the court erred in sustaining relevance objections to the following questions: "What was your mental state at the end of the meeting?" "What was your physical state at the end of the meeting?" Joseph contends his mental and

C.  *The Evidence Did Not Compel a Finding in Joseph's Favor*

1.  *Applicable Law and Standard of Review*

A party may file a motion to set aside a judgment based on actual fraud, perjury, duress, mental incapacity, mistake of fact, or failure to comply with disclosure requirements. (§ 2122, subds. (a)-(f).) "[B]efore granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief." (§ 2121, subd. (b).) The "fact the judgment may have been inequitable to the moving party cannot *by itself* serve as a basis for setting aside that judgment." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684; see § 2123 ["a judgment may not be set aside simply because the court finds that it was inequitable when made"].) The party seeking to set aside a judgment under section 2122 has the burden of proving one of the grounds for relief. (*In re Marriage of Diamond, supra,* 106 Cal.App.5th at p. 566; *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 88-89.)

Because Joseph had and failed to meet the burden of proving duress, we review the family court's ruling to determine whether the evidence compels a finding in Joseph's favor. ""In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals,"" the ""question for a reviewing court becomes whether the evidence compels a finding

---

physical states were relevant, but his lawyer asked those questions of Meir, not Joseph.

in favor of the appellant as a matter of law.""" (*In re Marriage of Diamond, supra,* 106 Cal.App.5th at p. 566; see *Jan F. v. Natalie F.* (2023) 96 Cal.App.5th 583, 593; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) ""'Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'""" (*Diamond*, at p. 566; see *Symons Emergency Specialties v. City of Riverside, supra,* 99 Cal.App.5th at p. 597.) "'We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence.'" (*Diamond*, at p. 567; see *Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.)

### 2. *The Evidence Did Not Compel a Finding Joseph Acted Under Duress*

Duress ""''includes whatever destroys one's free agency and constrains [him or her] to do what is against [his or her] will, and may be exercised by threats, importunity or any species of mental coercion . . . .'" [Citation.] It is shown where a party "intentionally used threats or pressure to induce action or nonaction to the other party's detriment. [Citation.]" . . . The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing.'" (*In re Marriage of Balcof, supra,* 141 Cal.App.4th at p. 1523; see *In re Marriage of Diamond, supra,* 106 Cal.App.5th at p. 571; *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 84.)

Citing *Leeper v. Beltrami* (1959) 53 Cal.2d 195, Joseph argues the family court erred in "requiring a direct link between Jennifer and the threats." *Leeper* does not support his argument.

In that case a seller sued to rescind a contract for the sale of real property based on duress. (*Id.* at p. 200.) The seller alleged third parties wrongly placed a lien on the property, even though they "knew at this time that nothing was due on either the note or the mortgages securing the same." (*Id.* at p. 201.) Under pressure to pay a judgment, the seller sold the wrongly encumbered property for one-third its actual value. (*Id.* at p. 202.) The Supreme Court held "allegations that [the purchaser] had knowledge of [the seller's] predicament are sufficient to give rise to the right of rescission." (*Id.* at p. 206.) The Supreme Court stated that, when the purchaser took "advantage, knowingly, of the wrongdoing of third parties," he "'connived' with the wrongdoers as that term is used [in] the statute relating to rescission." (*Ibid.*; see Civ. Code, § 1689, subd. (b)(1) [a party may rescind a contract if "the consent of the party rescinding . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds"]; *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1174 ["a party who enters into a contract under duress may obtain rescission against another contracting party, who, although not responsible for the duress, knows that it has taken place and takes advantage of it by enforcing the contract, particularly a contract made with inadequate consideration"].)

The evidence does not compel a finding Jennifer "connived" with anyone to compel Joseph to agree to the settlement. The family court found there was no evidence tying Jennifer to any of the threats Joseph described. Joseph admitted that Jennifer never threatened him directly and that he never heard Sheryl threaten his father. And Jennifer testified she never asked anyone to threaten Meir. The evidence did not compel a finding

29

that Jennifer knew about the threats or that Joseph received inadequate consideration for the settlement as a result of the threats.

Joseph also argues that the family court "erred in relying on the passage of time to reject duress" and that the coercion was "ongoing and cumulative." But the passage of time was relevant to whether duress caused Joseph to settle. Meir and Seidel testified they learned in June or July 2016 about Sheryl's threats to expose Meir's alleged money laundering and tax evasion.[11] (Formaker testified Fenster communicated the threat to him in December 2016.) Joseph signed the deal memo in August 2017 and the stipulated judgment in December 2017. The family court reasonably concluded that, even if Joseph felt pressure to settle in 2016 when Sheryl threatened to disclose information about Meir's alleged financial improprieties, he no longer felt that pressure eight months later when the parties agreed to settle, because the information "was disclosed information by then." Joseph's argument that the threats and pressure "persisted well into 2017" was not so compelling that it left no room for the family court's contrary finding. Moreover, after Joseph agreed to the terms of the settlement in July or August 2017, he had four or five months to reconsider and claim duress before he signed the stipulated judgment in December 2017. (See *In re Marriage of Rosevear*, *supra*, 65 Cal.App.4th at p. 686 [where the wife "had ample time to reflect or obtain other advice about what to do" during three months between agreeing to settle and signing the stipulated judgment, "that she nevertheless went ahead and

---

[11]    Seidel testified it was after the June 14, 2016 hearing on Jennifer's request for spousal support but before the family court's July 11, 2016 written decision.

signed the stipulated judgment is strong evidence that what she was experiencing was not duress, but 'buyer's remorse'"].)

Next, Joseph argues the family court "failed to consider the unconscionability of the judgment as evidence of duress." A court may not set aside a judgment solely because it is unconscionable or inequitable. (§ 2123.) And in any event, the judgment was not so inequitable that it compelled a finding of duress. Joseph asserts that Jennifer received $4 million from the sale of the June Street property and that he received only $675,000 in equalizing payments, which were allocated to past and future child support, and "some bank accounts of unspecified value." What Joseph does not mention is that he received a 10,000-square-foot home in Israel Jennifer said was worth $15 million.[12] Jennifer also gave up her claim to $1 million that had been in an Israeli bank account when she filed for dissolution, proceeds of a $2 million loan secured by a deed of trust on the June Street property, and trust income Jennifer claimed Joseph received during their marriage. Finally, the settlement relieved Joseph of any obligation to pay the children's private school tuition. Overall, not so unconscionable or inequitable.

Joseph also argues that the family court gave "undue weight to the boilerplate language" in the deal memo and stipulated judgment stating the parties entered the agreements freely and voluntarily, that the court ignored "uncontroverted

---

[12]    Joseph contended that, although the property was in his name, he owned only a 20 percent interest and that his siblings owned the rest.

and corroborated testimony" about threats,[13] and that the court "failed to scrutinize contradictions in Jennifer's testimony and position." The standard of review precludes us from reweighing the evidence. (See *In re Marriage of Alan Freeman* (2025) 110 Cal.App.5th 406, 417 ["we do not 'reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony'"].)

## DISPOSITION

The order denying Joseph's motion to set aside the judgment is affirmed. Jennifer is to recover her costs on appeal.

SEGAL, J.

We concur:

MARTINEZ, P. J.          FEUER, J.

---

[13] Even if Joseph's evidence of threats were uncontradicted (recall Jennifer did not present her evidence), it would not compel a finding in his favor. As discussed, the family court found that the threats did not deprive Joseph of his free will when he agreed to the settlement and that the threats were not sufficiently connected to Jennifer.